RONALD R. SILVERTON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent RONALD R. SILVERTON and B. SILVERTON v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Silverton v. Commissioner
Docket Nos. 8905-72, 8906-72, 8907-72, 7799-75.
United States Tax Court
T.C. Memo 1977-198; 1977 Tax Ct. Memo LEXIS 242; 36 T.C.M. (CCH) 817; T.C.M. (RIA) 770198; June 28, 1977, Filed *242 Petitioner was the owner of a law firm that provided legal services to union groups and their members, church groups and their members, and ethnic groups, mostly on a contingent-fee basis. Petitioner was incarcerated in 1972 and sold the business. Held: 1. Case-preparation and litigation costs advanced by petitioner and recoverable only from the proceeds of suit or settlement were not deductible by petitioner in the year advanced unless the case was closed out in that year. Canelo v. Commissioner,53 T.C. 217 (1969), and Herrick v. Commissioner,63 T.C. 562 (1975), followed. 2. Amounts of deductible "employee extraordinary expenses" consisting of meeting with and entertaining leaders and members of the groups determined. 3. Petitioner failed to satisfy the substantiation requirements of section 274 with respect to travel and entertainment expenses. 4. Petitioner may not deduct in 1969 an amount designated as prepaid interest. 5. The cost of a trailer used by petitioner as an office was a capital expenditure rather than a business expense. 6. Petitioner realized ordinary gain on the sale of his law business in 1972; amount of gain determined. 7. Petitioner sold his *243 office building and furniture and fixtures in 1972; amount of gain determined. 8. Petitioner is not liable for the addition to tax under sec. 6653(a), I.R.C. 1954, for the years 1968, 1969, and 1970. 9.Petitioner is liable for the addition to tax under sec. 6651(a), I.R.C. 1954, for the year 1972. Ronald R. Silverton, pro se. John O. Kent, for respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined deficiencies and additions to tax in respect of petitioners' Federal income tax liability as follows: Docket
Addition to tax under No.
(Petitioners)
Year
Deficiency
sec. 6651(a)
sec. 6653(a) [1]
8905-72
Ronald R. Silverton
1968
$ 78,557.30
$ 3,927.86
8906-72
Ronald R. Silverton
1969
201,233.00
10,061.65
8907-72
Ronald R. Silverton
and B. Silverton
1970
168,003.44
8,400.17
7799-75
Ronald R. Silverton
and B. Silverton
1972
6,874.84
$1,718.71 Certain concessions have been made by the parties so that the following principal issues remain for decision: (1) Whether petitioners are entitled to deduct as ordinary and necessary business expenses under section 162 the *244 amounts expended in each of the years 1968 through 1972, inclusive, as case-preparation and litigation costs for petitioner's clients, where recovery of such costs is contingent upon the successful settlement or prosecution of the clients' claims; [2]
(2) Whether the "employee extraordinary expenses" deducted by (petitioners) in each of the years 1968 through 1971, inclusive, constitute entertainment expenses to which section 274 applies, and if so, whether such expenses have been substantiated as required by section 274; [3]
(3) Whether petitioners have satisfied the substantiation requirements of section 274 so as to entitle them to the various business deductions claimed in 1968, 1969, and 1970 for travel and entertainment expenses; (4) Whether petitioner Ronald R. Silverton may deduct in 1969 a prepaid interest expense payment in the amount of $21,482.55; (5) Whether the cost of a trailer acquired in 1969 for use as an office constitutes a deductible business expense or a capital expenditure; (6) Whether petitioner Ronald R. Silverton realized gain upon the sale of his law practice in 1972 and if so, the character of that gain; (7) Whether certain property (an office building, furniture *245 and fixtures) used by petitioner Ronald R. Silverton in his law practice was sold by petitioner in 1972 [4] *246 and if so, the amount of gain realized therefrom; (8) Whether in each of the years 1968, 1969, and 1970 petitioners are liable for the addition to tax asserted by respondent pursuant to section 6653(a) for negligence or intentional disregard of rules and regulations; and (9) Whether petitioners are liable for the addition to tax asserted by respondent pursuant to section 6651(a) for petitioners' failure to file timely their 1972 income tax return. [5] FINDINGS OF FACT Some of the facts have been stipulated and are accordingly so found. Petitioners Ronald R. Silverton and B. Silverton (also known as Hilda Silverton) were married in 1970, and at the time of the filing of the respective petitions herein petitioners resided in Los Angeles, Calif.
Petitioner Ronald R. Silverton filed a joint return for 1968 with his then-wife Fawn Silverton. For 1969, Ronald R. Silverton filed an individual income tax return as to which the parties agree petitioner was entitled to head-of-household status. Petitioners Ronald R. and B. Silverton filed a joint income tax return for each of the years 1970 through 1973. [6] All of petitioners' income tax returns for the period 1968-1973 were timely filed except that for 1972 which was filed with the Fresno Service Center on February 5, 1974. Hereinafter we shall refer to Ronald R. Silverton as either petitioner or Silverton since the issues presented pertain to his *247 activities and involve B. Silverton only because she filed a joint return with her husband for those years in issue after 1969. During the years in issue, and prior to August 1972, petitioner, a lawyer, owned and operated the law firm of Silverton & Silverton. [7] *248 The firm employed a staff of approximately 70 persons, of whom 14 were lawyers. The firm's principal office was located in Los Angeles, Calif. During the years in question, petitioner's law firm also had offices in Santa Ana, San Diego, Wilmington, and San Francisco, Calif.
Petitioner entered the practice of law in 1958 and, as of the time period involved herein, had gradually developed an extensive practice comprised primarily of group legal services for existing organizations such as church groups and labor unions. In exchange for a nominal monthly retainer, petitioner's firm provided members of the particular church or union group with legal advice. On schedule C of his income tax returns petitioner reported gross receipts, less returns and allowances, and net profit for his law firm for the years and in the amounts following: 1968
1969
1970
1971
1972
Receipts
$968,522
$1,145,614
$1,300,536
$1,621,727
$437,905
Net profit
53,474
80,500
171,343
14,391
(77,445)
Most of the firm's income was derived from personal injury and/or workman's compensation claims prosecuted on behalf of participants in the group programs. [8] For cases involving either type of claim, the firm operated under a contingent-fee arrangement. Once it was determined after initial consultation that the claim had sufficient merit so as to warrant its prosecution, the client executed a retainer which provided that case-preparation and litigation costs (investigation expenses, *249 filing fees, witness fees, etc.) would be paid by the firm and that only upon the successful prosecution or settlement of the claim would the firm be entitled to recover those costs. Upon a recovery, either by settlement or after trial, the case-preparation and litigation costs which had been recorded on the client's ledger were repaid to the firm from the amount recovered. The firm's fee, 33-1/3 percent of a settlement payment and 40 percent of a judgment award, was then computed on the basis of the net proceeds. If the case were lost, the costs were borne by the firm, and the client owed nothing. Nor was a client obligated to pay the unrecovered costs in the event the settlement or judgment received was less than the case preparation and/or litigation expenses incurred by the firm. Petitioner characterized his clientele as predominantly "working-class" and estimated *250 that 75 to 85 percent of the firm's clients were members of an ethnic minority. Petitioner believed that by virtue of the group programs and the contingent-fee policy, he was able to provide legal services to clients who might not otherwise have been able to afford them. Where a client to whom legal services had been rendered on a fixed fee basis (see fn. 8, supra ) was unable to pay, collection of the account receivable established therefor was not enforced; petitioner never sued an individual client for fees owed to the firm. For each client represented under the contingent-fee arrangement, the firm maintained a ledger card on which were recorded the case-preparation and/or litigation costs paid by the firm in connection with the client's case. Prior to, and including the years in issue, all such costs paid during a taxable year were treated as current business expenses and deducted by petitioner on schedule C (Profit (or Loss) From Business or Profession) of his income tax return for that year even though at year's end a number of the cases to which the deducted expenditures related remained out-standing and were not closed until a subsequent taxable year. When a case was closed *251 after settlement or trial, both the case-preparation and/or litigation costs recovered and the firm's contingent fee were included in income in the year of receipt. Where, on the basis of periodic reports submitted by the firm's department heads, cases were designated as dead (i.e., inactive) or lost, the costs reported on the corresponding client ledger cards were added up at the end of the year and entered on the firm's books as a bad debt. This total was a balancing entry only; that is, the bad debt entry for a particular year was not used in petitioner's computation of taxable income for that year since it reflected amounts which had already been claimed as deductions. [9]
Specifically, on schedule C of his income tax return for each of the years 1968, 1969, and 1970, petitioner deducted the firm's current case-preparation and litigation expenses. *252 Of these deductions claimed, respondent disallowed the respective amounts of $35,179.20, $61,489.93, and $72,397.08, which he instead determined to be deductible in 1971. For 1971 and 1972, respondent disallowed $77,843 and $21,019, respectively, of the current case-preparation and litigation expenses claimed by petitioner in those years; of the $77,843 disallowed for 1971, respondent determined $38,922 to be allowable for 1972. The amount disallowed by respondent in each year represents the excess of current case-preparation and litigation expenses deducted by petitioner over the sum of (1) the costs recovered and included in income for the year and (2) the expenses attributable to cases lost or otherwise closed during the year. For each general category of organizations participating in the group programs, i.e., the union groups and the church groups, petitioner employed a liaison person whose duties entailed meeting with a group's representatives to discuss problems and complaints pertaining to the firm's services to that group's members. The liaison person served to facilitate communication between the particular participating group and the firm; that individual was not a *253 lawyer and rendered no legal advice. Arthur L. Ball (hereinafter referred to as Ball) performed the liaison function for union groups. Ball began serving the firm in this capacity in 1966 when approximately 6,000 or 7,000 individual members (exclusive of their families) participated in the union group programs; by 1972, the number of individual union group members exceeded 100,000. Ball met 10-20 times a week with various union group representatives; about 75 percent of the meetings were on Ball's initiative. These appointments often took the form of either luncheon or dinner meetings with anywhere from one to fifteen other persons for whom Ball paid the expenses of the meal. For some of the evening and/or weekend meetings, Ball provided, on behalf of the firm, tickets to football, basketball, or baseball games. Ball attended most, but not all, of such sporting events; occasionally, petitioner accompanied Ball and the union group members. In addition to these meetings and sporting events, Ball's activities included sponsoring, once or twice a month, a hospitality suite and bar at conventions of participating union groups. At Christmas time, Ball gave various participating *254 union groups a total of approximately 30 - 40 cases of liquor, at a cost of $75 - $78 per case. For the church groups, which had increased from 20 in 1968 to over 1,000 by 1972, petitioner employed Reverend Horace Ross (hereinafter referred to as Ross) as the liaison person. Ross visited approximately 35 - 40 churches per week, either to check on problems and complaints of participating church groups or to provide information to ministers who had expressed an interest in joining the church-group program. Ross usually met only with the minister and after each visit would leave an offering of $25. About twice a week, Ross, and sometimes petitioner, also attended banquets given by various participating church groups, for which occasions the firm usually paid $100 for a table. During and after these banquets Ross and/or petitioner explained the firm's program to, and answered questions of, the members of the groups attending these functions. Ross and Ball received the funds for their expenses from petitioner both in advance and by reimbursement. In the former instance, petitioner wrote checks either to Ball or Ross or to another employee who would cash them; Ball or Ross would thereafter *255 provide petitioner with information as to the date and amount of the expenditure, the group involved, and sometimes the business problem discussed. For reimbursement, Ball and Ross submitted expense sheets to the firm's bookkeeper. These expenses were reflected in accounts designated "Extra-ordinary Employee Expense" and further categorized according to the type of legal work to which they related, i.e., "Extra-ordinary Employee Expense - Personal Injury," "Extra-ordinary Employee Expense - Workmen's Compensation," etc. On the basis of these accounts, the following amounts were deducted on schedule C of petitioner's income tax returns: [10]
1968
$ 78,728
1969
110,083
1970
147,812
1971
199,344
All of these amounts were disallowed by respondent, except that claimed for 1971 which was allowed to the extent of $25,000. Petitioner estimated that of the total $510,967 disallowed by respondent, $200,000 was expended by Ball in conjunction with the union groups, $250,000 by Ross for church group liaison expenses, and the balance by *256 other employees [11] for additional liaison expenses. Although the parties have stipulated that all of the checks relating to the "Extra-ordinary Employee Expenses" were made available to respondent and respondent has not questioned that the expenditures were made, petitioner did not offer in evidence any actual receipts, books, or records pertaining to these expenses. In addition to the activities of the liaison personnel which generated the "Extra-ordinary Employee Expenses," petitioner traveled to meet with various participating groups and incurred expenses incident to such meetings. On schedule C of his income tax return for each of the years 1968, 1969, and 1970, petitioner deducted, and respondent disallowed, expenses for business travel and entertainment, as follows: TYE
Amount claimed
Amount disallowed
1968
$12,506.00
$ 7,460.48
1969
19,894.00
11,785.54
1970
6,172.27
6,172.27 The parties have stipulated that respondent's auditors requested and saw a substantial number of dated bills for these amounts and verified payment thereof in 1968 *257 and 1969, for which years the expenses were deducted. These bills showed the place of entertainment, the date, and the amount. For the years 1968, 1969, and 1970, petitioners also claimed itemized deductions for business entertainment expenses in the respective amounts of $2,601.97, $2,000, and $3,200, all of which respondent disallowed in full. On several occasions each year petitioner gave rather large parties at his home to which many of the leaders in the various groups were invited. As part of a loan transaction, in 1967 petitioner executed several promissory notes in favor of the creditor. The parties have stipulated that the notes were in amounts ranging from $5,000 to $51,000, at interest rates from 5 percent to 6 percent, and executed for a legitimate business purpose. Prior to 1969, petitioner and the creditor entered into an agreement pursuant to which all payments made in 1969 by petitioner were to be considered interest. Petitioner paid his creditor a total of $21,482.55, which amount petitioner included in the interest expense deduction claimed on his income tax return for 1969. [12] Respondent disallowed petitioner's interest deduction to the extent of $21,482.55. *258 Sometime in 1969, petitioner purchased land in Santa Ana on which to locate a branch office for the firm. Thereafter in 1969 petitioner purchased a trailer to be used as an office until such time as an office building was constructed. The trailer occupied only a small portion of the land. The trailer was movable; no foundation was built for it. Some landscaping was done on the land. A depreciation account was set up in petitioner's books to reflect the acquisition of the trailer. On his income tax return for 1969, petitioner claimed a miscellaneous expense deduction of $40,600 for the entire cost of the trailer. Respondent disallowed this deduction and instead determined that a depreciation deduction of $256, computed according to the straight-line method on the basis of a 40-year useful life, was allowable for the period of use in 1969. In 1972, the trailer was removed and sold for *259 $5,000. On August 18, 1972, petitioner, on behalf of the Silverton Law Corp., entered into an agreement with Max Abrams and Thomas E. Reeks, both lawyers employed by the firm, whereby petitioner sold his law practice to Abrams and Reeks. In pertinent part, the agreement provides as follows: It is hereby agreed by and between Silverton Law Corp., hereinafter called seller and Max Abrams and Thomas E. Reeks, hereinafter called buyers. The buyers will purchase and the seller will sell the assets, including case files, accounts receivable of any nature, choses in action (which includes eight (8) cases that Attorney James H. Davis has on a contingency basis, this does not include the six (6) cases discussed in the next to last paragraph below), equipment and supplies of the Silverton Law Corp. Said case files shall include all cases presently in progress at 3630 Wilshire Blvd., L.A., regardless of the designation as to attorney of record. For a total purchase price of $200,000.00 payable as follows: 1) $40,000.00 cash. Ronald R. Silverton shall use this money to cure the delinquency on the note secured by the first trust deed on the Bldg. at 3630 Wilshire Blvd. Seller states this *260 for its own purposes but buyers are in no way concerned with it. 2) Assumption and payment of seller's debts of $113,000.00 as listed on attachments (buyers and sellers names appear thereon and todays date). * * *
3) $42,000.00 payable to David Silverton, a creditor of seller; at the rate of $1500.00 per month including interest at 4%. 4) $5,000.00 payable to Silverton Law Corp.; $2500.00 in the month of August 1972 and the balance in the month of September 1972. * * *
The effectiveness of this agreement shall not be contingent upon the performance or non-performance by Ronald R. Silverton of any contract for the sale of the real property known as 3630 Wilshire Blvd. Los Angeles. The obligations and benefits of the transfer of the law business shall be effective as of August 1, 1972. [Italicized portion reflects handwritten, initialed addition.] In addition to this agreement for the sale of petitioner's law practice (hereinafter referred to as the business agreement), the following document (hereinafter referred to as the property agreement) was executed on August 18, 1972: It is hereby agreed by and between Ronald R. Silverton hereinafter called seller and Max Abrams, Thomas E. *261 Reeks, Madeline A. Dykes, Doyle Phillips, hereinafter called buyers. The buyers will purchase and the seller will sell on September 15, 1972, the real property and furniture, fixtures located at 3630 Wilshire Blvd., L.A. and the two parking lots, one contiguous to the south portion of the building and the second approximately 90' south of the building, excluding furnishings belonging to David Silverton, Lillian Edwards and two stenorette outfits. The purchase price will be $730,567.57, payable as follows: 1. Assume existing first trust deed in the approximate amount of $490,000.00, payable $5600.00 per month P.I.T.I. 2. Take subject to second trust deed in the approximate amount of $35,000.00 which shall be payable at the rate of $1100.00 per month including 6% interest to Fawn Silverton. 3. Buyers to execute and seller to carry back three promissory notes secured by a single purchase money deed of trust in the amount of $202,000.00, payable at the rate of $1850.00 per month, all due and payable within three (3) years, payable as set forth below. Concurrently with the execution of the said notes and the above mentioned deed of trust, seller does hereby create a trust on behalf *262 of Henry McGaskey, Dorothy McGlothen, and Edward Vasquez and does irrevocably assign this deed of trust and said notes to said trust, the terms of which will hereinafter be set forth. As to the seller, this provision is a necessary part of this agreement for his own reasons, but otherwise buyers are in no way concerned with this provision. However, pursuant to this assignment to the trust by seller (who is the trustee) buyers do agree to make payments to the beneficiaries thereof who shall be promissees- each of one of the three promissory notes, with the terms as follows: * * *
4. Assume and pay seller's existing debts amounting to $1423.93 to Bank of America and Master Charge. Buyers shall pay not less than $300.00 per month on this debt. 5. Pay to seller in cash the sum of $2143.64 during the month of October 1972. * * *
In a separate agreement dated August 18, 1972, the parties to the above two agreements further provided: It is agreed that the agreements this day delivered by Ronald R. Silverton to Thomas E. Reeks, Max Abrams and Madeline Dykes on behalf of herself and Doyle Phillips are not efficacious unless the sum of $40,000.00 is delivered to David Silverton (for use *263 in curing the delinquency on the promissory note secured by the first trust deed on the building at 3630 Wilshire Blvd.) on or before 8/21/72. The above-mentioned building at 3630 Wilshire Blvd. had been purchased by petitioner in 1971. The acquisition was, in part, financed by a $500,000 loan to petitioner from Western Mortgage Corp., in consideration for which petitioner, on March 12, 1971, executed an installment note secured by a deed of trust (dated March 12, 1971) on the property located at 3630 Wilshire Blvd. As of August 18, 1972, petitioner was in default on the loan. The default was cured by payments on August 21, 1972, and August 23, 1972, of $37,497.57 and $90, respectively, received from David Silverton. Thereafter, no payments were made on the loan. On October 1, 1972, the parties to the agreement of August 18, 1972, executed an amendment thereto which provided, inter alia: (1) of the cases mentioned in the first paragraph of the business agreement which were reserved by petitioner, petitioner assigned to Reeks all claim or right to five of the cases; (2) "[in] lieu of any other payments called for to Ronald R. Silverton" under either the business or property agreements, *264 the buyers were to pay to Hilde Silverton a total of $25,000 (which amount was apparently evidenced by an installment note given to petitioner and subsequently negotiated at a discount for $18,000); (3) in addition to the debts of $113,000 specified in the business agreement, the buyers agreed to assume other obligations amounting to $20,000; (4) the parties acknowledged that "* * * the sale of the business of the Silverton Law Corporation is not contingent upon the sale of the real-property * * *;" and (4) in clarification of the property agreement, certain furniture and equipment (that belonging to David Silverton and certain items reserved to petitioner, such as a desk, three chairs, a filing cabinet, two stenorettes, and an electric typewriter) were excluded from the transfer. The real property subject to the property agreement of August 18, 1972, was conveyed by petitioner to the purchasers by grant deed dated September 12, 1972, notarized October 10, 1972, and recorded on October 19, 1972. Sometime in December 1972, petitioner learned that the buyers had not made certain of the payments to petitioner's creditors as required to discharge their obligations under the two agreements *265 of August 18, 1972. Petitioner discussed the matter with Reeks and indicated that he wanted the real property back in order to try to sell it and use the proceeds to pay his creditors. By deeds dated January 27, 1973, Reeks and the other grantees under the deed recorded on October 19, 1972, supra, conveyed the real property, subject to all encumbrances, to Harvey Sklar, a "strawman" for petitioner. Sklar and Reeks then entered into an agreement whereby a portion of the building and parking lot at 3630 Wilshire Blvd. was leased to Reeks. Also on January 27, 1973, petitioner executed the following document: IN CONSIDERATION OF THE execution by THOMAS E. REEKS of a grant deed and the execution of a quit claim deed by DELMA J. REEKS, of the property located at 3630 Wilshire Boulevard, to Harvey Sklar, a single man, on this date, Ronald R. Silverton hereby remises, releases and forever quit-claims to THOMAS E. REEKS any right, title or interest that he claims to have, in the furniture, furnishings or fixtures located at 3630 Wilshire Boulevard, Los Angeles, and does hereby affirm the Bill of Sale previously executed to same. This is a disputed claim, and this documents [sic] is given *266 as a compromise settlement of said claim. Thomas E. Reeks does not acknowledge that there was any merit in Ronald R. Silverton's claim. Ronald R. Silverton agrees to execute this instrument only because THOMAS E. REEKS said that otherwise he would not sign the deed on 3630 Wilshire Boulevard to Harvey Sklar. On February 9, 1973, Reeks signed a document captioned "CLARIFICATION OF AGREEMENT OF 8/18/72 - Purchase of Business of Silverton Law Corp. by Thomas E. Reeks, Esquire," which, in pertinent part provided: It is acknowledged by the undersigned parties hereto which were the parties to the agreement of 8/18/72 in which the assets of the Silverton Law Corp. were purchased by Thomas Reeks that: 1) Implicit within the purchase of the assets and an integral part of the overall purchase price is the agreement of Ronald R. Silverton not to compete in the practice of law within an area of five square miles for a period of two years. This asset is considered integral to the purchase price which to the extent of the full amount is in consideration of this non-competition clause. Provided however, that each of the business debts agreed to be paid is also a necessary part of the consideration; *267 and there shall be considered a failure of consideration if they are not paid- or if any of them are not paid. 2) The other debts agreed to be paid by Thomas Reeks are also an integral part of the purchase price. Thomas Reeks and Hilde Silverton have agreed that in lieu of any additional payments to her that Thomas Reeks shall execute a promissory note to Max Abrams for the amount of $10,000, payable on the first of each month at the rate of $2500 each and every month, commencing on March 1, 1973. 3) That Thomas Reeks shall in lieu of the additional payments called for by agreement of 8/18/72 to David Silverton, make a promissory note (non-interest bearing) to "David Silverton or order" in the amount of $34,500, payable on the first of each and every month commencing March 1st, 1973 at the rate of $1500 per month. It is understood that David Silverton plans to sell and assign this note. * * *
This document was not signed by petitioner. On February 15, 1973, petitioner wrote to Reeks, stating in the letter that: I only desire that you honor your agreements with me. Thus far your failure to do so has given me concern. I refer to: 1) The fact that your agreement to purchase the *268 building was breached. This agreement called for you to make payments on the note secured by the deed of trust held by Western Mortgage in the amount of approximately $485,000. You not only permitted this note to go into default by you [sic] failure to make even one payment during the more than six months that you occupied the premises; but you intentionally promised me and certain attorneys representing the creditors who had liens on the building that you were only permitting a default to exist to force Western Mortgage to pay-off [sic] a prior lien which was an obligation of yours under our agreement- * * *. These assurances by you were many and continuous. They stopped with less than four working days to go to cure the default. At that time you informed me that you were not going to cure it. And then to add duress to the situation, you refused to permit a deed so that I could attempt to obtain someone else to purchase the premises, thus saving my equity in the building and the security of my creditors, unless I signed an agreement giving you title to the personal property which clearly was included only in the agreement to sell the building.
* * *
Subsequently, Western Mortgage *269 Corp. foreclosed on its loan to petitioner; the unpaid principal amounted to $487,690.50. Pursuant to a "Notice of Trustee's Sale" dated February 7, 1973, the property at 3630 Wilshire Blvd. was sold at a foreclosure sale on March 8, 1973, for a total of $526,521.62. In late 1971 or early 1972 petitioner was indicted and convicted of subornation of perjury and was sentenced to the State penitentiary. He was incarcerated from January 28, 1972, until December 10, 1972. His conviction was reversed on appeal and upon retrial he was acquitted. Also in April 1972 petitioner was convicted of conspiracy to obtain money by false pretenses, and his conviction was affirmed on appeal. On November 9, 1972, upon finding that the crimes involved moral turpitude, petitioner was suspended from the practice of law by the Supreme Court of California. Subsequently petitioner was disbarred from the practice of law by the Disciplinary Board of the State Bar (Calif.) which action was sustained on appeal by the Supreme Court of California. [13]
Petitioner's income tax return for 1972 reported gross receipts from his law practice in the *270 amount of $437,905. The return further showed a negative adjusted gross income of $377,312.52, comprised in part of the $141,426 loss which petitioner claimed as a result of the sale of his law practice. Respondent determined that petitioner realized ordinary gain on the sale in the amount of $29,916.36, computed as follows: [14] *271 Sales Price:
$202,856.36
$22,856.36 cash (the
amendment of 10/1/72 sub-
stitutes a $25,000 payment
in lieu of $40,000 and
$2,143.64 required under
the business and property
agreements, respectively.
113,000 liabilities assumed
under 8/18/72 agreement
20,000 additional liabilities
as per 10/1/72 amendment
42,000 payable to David
Silverton under 8/18/72 agreement
5,000 payable to Silverton Law
Corp. under 8/18/72 agreement
(Less:) [15]
Adjustment for assumption of
seller's debts paid by seller
(39,826.24)
Adjustment for business payable
paid by purchaser
(73,173.76)
Net Sales Price
$89,856.36
(Basis: Loans to Clients)
(59,940.00)
Gain
$29,916.36 Petitioner's 1972 income tax return did not reflect the transfer pursuant to the property agreement of August 18, 1972. Respondent determined that petitioner realized in 1972 gain of $136,031.57 from the sale of petitioner's office building, furniture, and fixtures, computed as follows: Consideration Received
$490,567.57
Relief of Indebtedness
(first trust deed)
$487,000.00
Payments by purchaser
3,567.57
(Basis in Property)
(354,536.00)
Land
250,000.00
Building and furnish-
ings as adjusted
104,536.00
Gain
$136,031.57
The parties have stipulated that depreciation on the building at 3630 Wilshire Blvd., computed for the entire year 1972, is $20,359 and that $21,412 constitutes the full year's depreciation on the furniture and fixtures at 3630 Wilshire Blvd. The parties further agree that as of September 15, 1972, the adjusted basis of the furniture and fixtures at 3630 Wilshire Blvd. was $35,714. In the respective statutory notices issued to petitioner for 1968, 1969, and 1970, respondent asserted additions to tax under section 6653(a) in the amounts of $3,927.86, $10,061.65, and $8,400.17. For 1972, respondent asserted *272 an addition to tax pursuant to section 6651(a) in the amount of $1,718.71. [16]
OPINION In each of the years 1968 through 1972, inclusive, petitioner claimed a deduction for the amounts paid by his law firm in the respective years for case-preparation and/or litigation costs incident to the prosecution of personal injury or workmen's compensation cases where recovery of such costs was contingent upon the successful settlement or litigation of the case. The issue raised thereby which we must decide is whether the costs advanced on behalf of clients are, as petitioner maintains, ordinary and necessary business expenses deductible under section 162, or whether, as respondent determined, notwithstanding the contingent nature of the firm's right to reimbursement, such advanced costs constituted loans and as such, are not deductible except to the extent that costs remain unrecovered when a case is lost or otherwise closed. We agree with respondent that our prior opinions in Canelo v. Commissioner,53 T.C. 217 (1969), affd. per curiam 447 F. 2d 484 (9th Cir. 1971), and *273 Herrick v. Commissioner,63 T.C. 562 (1975), require characterization of the costs at issue as loans. [17] *275 Canelo v. Commissioner,supra, involved a law firm which engaged primarily in plaintiffs' personal injury litigation on a contingentfee basis similar to the arrangement herein: Costs advanced by the firm were repaid only in the event of a settlement or judgment in favor of the client; and if there were no recovery, the client owed nothing. The law firm screened prospective clients and took only cases as to which it had "good hopes" of recovery. In holding that the advanced costs constituted loans, rather than business expenses deductible under section 162, the Court began its analysis by reference to the general proposition: "It has been firmly established that where a taxpayer makes expenditures under an agreement that he will be reimbursed therefor, such expenditures are in the nature of loans or advancements and are not deductible as business expenses." Josef C. Patchen,27 T.C. 592, 600 (1956). Accord, Levy v. Commissioner,212 F. 2d 552 (C.A. 5, 1954), affirming a Memorandum Opinion of this Court; Glendinning, McLeish & Co.,24 B.T.A. 518 (1931), affd. 61 F. 2d 950 (C.A. *274 2, 1932); Henry F. Cochrane,23 B.T.A. 202 (1931). * * * [53 T.C. at 224.] The Court rejected petitioners' attempt to distinguish the above-cited cases by virtue of the contingent nature of petitioners' right to reimbursement, asserting that: This Court, however, has previously held that living expenses and medical expenses advanced to clients under contingent fee (and contingent reimbursement) contracts are in the nature of loans and thus not deductible under section 162(a). Warren Burnett,42 T.C. 9 (1964), affirmed and remanded 356 F. 2d 755 (C.A. 5, 1966), certiorari denied 385 U.S. 832 (1966); Reginald G. Hearn,36 T.C. 672 (1961), affd. 309 F. 2d 431 (C.A. 9, 1962), certiorari denied 373 U.S. 909 (1963). In our opinion those cases are not distinguishable, as petitioners suggest, as instances of mere money-lending, unrelated to the taxpayer's law practice. The plain holding of the Burnett case is that "petitioner's expenditures constituted advances to his clients which were virtually certain to be repaid and, consequently, were not deductible as business expenses." 356 F. 2d at 759. The *276 Court of Appeals pointed out that the requirements of a loan for purposes of section 166 do not determine what constitutes an ordinary and necessary business expense under section 162(a). In view of petitioners' practice of screening clients and their "good hopes" of recovery, we think it is clear that the advances herein were intended to, and did, operate as loans rather than expenses under section 162(a). [53 T.C. at 224.] Dismissing petitioners' further arguments, the Court went on to state that: Petitioners attempt to distinguish the Burnett case on the ground that it involved advances of significant amounts of money for living expenses. Certainly the amount of the expenditure does not determine whether the advances fall into the category of deductible business expenses. And, as we view it, the different uses of the advanced funds is a distinction without substance. What is important is the nature of the facts and circumstances under which the expenditures are made. If expenditures are made with the expectation of reimbursement, it follows that they are in the nature of loans, notwithstanding the absence of formal indebtedness. * * * Petitioners stress that their position *277 is no different from the ordinary businessman who makes expenditures only on the likelihood that he will recover them in the course of business. We believe the situations are different. Here petitioners have made expenditures on behalf of a particular client, under a reimbursement agreement signed by the client, to pursue a claim held by the client--a claim of no use to any person other than the client. In reality, they are the client's expenditures. [53 T.C. at 225; cits. and fn. reference omitted.] In Herrick v. Commissioner,supra, this Court found that the failure of the record therein to reveal the specific agreement between the petitioner and his clients provided "* * * no factual or legal distinction between this case and Adolph B. Canelo III * * *." 63 T.C. at 567; accordingly, we there held that the litigation costs advanced by petitioner on the understanding that petitioner would be repaid from the recovery of the client were in the nature of loans, not deductible business expenses. Applying the Canelo and Herrick cases to the instant situation, we find no merit in petitioner's contention that the contingent character of the firm's right to reimbursement precludes treatment *278 of advanced costs as loans. See Canelo v. Commissioner,supra at 224. Similarly, we can accord no significance to petitioner's assertion that the right to repayment is derived from the receipt of proceeds rather than the personal obligation of the client. See Canelo v. Commissioner,supra at 225. Nor do we believe that petitioner's prospects of recovery were so uncertain as to distinguish the instant circumstances from those in the Canelo and Herrick cases. We recognize, as petitioner points out, that in both the Canelo and Herrick cases, some screening procedures were used to select the claims which would be prosecuted on a contingent fee basis, whereas petitioner's firm apparently handled all of its personal injury and workmen's compensation cases on a contingent fee, and that in both cases the Court expressly found that costs were advanced with "good hopes" and/or a "reasonable expectation" of recovery. Such differences do not a distinction make. Petitioner testified that the firm pursued only those clients' claims which after initial consultation were considered meritorious. In essence, petitioner, too, engaged in a sort of screening process to select the cases subject to *279 a contingent fee arrangement, the net effect of which was to increase the likelihood of recovery. Any argument to the contrary is undermined by the fact that the bulk of petitioner's practice and major source of income was derived from personal injury and workmen's compensation cases. Moreover, petitioner presented no evidence as to the number of cases prosecuted on a contingent-fee basis which resulted in no recovery or a recovery insufficient to cover the costs incurred. Nor did petitioner offer evidence to show what amount and percentage of the total case preparation and litigation costs incurred in a particular year were not ultimately recovered. In the absence of any such proof by which we might more precisely assess the prospect of recovery, we find no basis upon which to distinguish the instant case from Canelo v. Commissioner,supra, and Herrick v. Commissioner,supra.
In addition to contesting respondent's theory of this issue, petitioner contends that the amounts disallowed by respondent are unreasonable and inaccurate by virtue of respondent's failure to make a more extensive examination of petitioner's books and records. Suffice it to say that it is petitioner who *280 bears the burden of proof herein; if examining the firm's books and records would have revealed facts to disprove the correctness of respondent's determinations, it is petitioner's failure to do so which is of consequence herein. Similarly, we find petitioner's resort to alleged record-keeping difficulties created in accounting for the advances as loans to be unavailing. Cf. sec. 6001. Indeed, as indicated in our findings, supra, as to the firm's bookkeeping practices, the firm did maintain sufficiently detailed records from which to ascertain the costs to be accounted for as loans, given time to do so. On the basis of the foregoing, we hold that the case-preparation and litigation costs paid in each of the years 1968 through 1972, inclusive, were in the nature of loans and as such, do not constitute business expenses deductible under section 162. With regard to the "Extra-ordinary Employee Expenses" incurred incident to the firm's liaison activities and that were deducted by petitioner in each of the years 1968 through 1971, inclusive, the issue raised thereby is whether such expenditures constitute expenses subject to section 274, [18] *282 and if so, whether petitioner has satisfied *281 the substantiation requirements of section 274(d). [19] *283 As framed by the parties, application of section 274 depends on whether the liaison expenditures were in the nature of entertainment (or gifts). [20] Petitioner maintains that, except for the relatively small amounts expended for sporting events, the expenses incurred by Ball, Ross, and others in the performance of their liaison function constitute business communication, not entertainment, expenses. We believe petitioner misconstrues the meaning of entertainment as *284 contemplated by section 274 and the regulations thereunder. Implicit in section 274 is the recognition that certain activities and expenditures therefor, which generally partake of a business character, occur in contests or include elements that, absent the business aspects, would otherwise be categorized as entertainment. Section 1.274-2(b), Income Tax Regs., provides: (b) Definitions--(1) Entertainment defined--(i) In general. For purposes of this section, the term "entertainment" means any activity which is of a type generally considered to constitute entertainment, amusement, or recreation, such as entertaining at night clubs, cocktail lounges, theaters, country clubs, golf and athletic clubs, sporting events, and on hunting, fishing, vacation and similar trips, including such activity relating solely to the taxpayer *285 or the taxpayer's family. The term "entertainment" may include an activity, the cost of which is claimed as a business expense by the taxpayer, which satisfies the personal, living, or family needs of any individual, such as providing food and beverages, a hotel suite, or an automobile to a business customer or his family. * * * (ii) Objective test. An objective test shall be used to determine whether an activity is of a type generally considered to constitute entertainment. Thus, if an activity is generally considered to be entertainment, it will constitute entertainment for purposes of this section and section 274(a) regardless of whether the expenditure can also be described otherwise, and even though the expenditure relates to the taxpayer alone. This objective test precludes arguments such as that "entertainment" means only entertainment of others or that an expenditure for entertainment should be characterized as an expenditure for advertising or public relations. However, in applying this test the taxpayer's trade or business shall be considered.Thus, although attending a theatrical performance would generally be considered entertainment, it would not be so considered *286 in the case of a professional theater critic, attending in his professional capacity. Similarly, if a manufacturer of dresses conducts a fashion show to introduce his products to a group of store buyers, the show would not be generally considered to constitute entertainment. However, if an appliance distributor conducts a fashion show for the wives of his retailers, the fashion show would be generally considered to constitute entertainment. In view of the scope accorded entertainment under the regulations, such of the liaison activities as luncheon and dinner meetings, sporting events, and conventions and banquets constitute entertainment within the ambit of section 274. [21] Cf. Andress v. Commissioner,51 T.C. 863, 867 (1969), affd. per curiam 423 F. 2d 679 (5th Cir. 1970). Similarly, we find that the expenditures incurred for the liquor distributed by Ball were for gifts as described in section 1.274-2(b)(1)(iii) of the regulations: (iii) Special definitional rules--(a) In general. Except as otherwise *287 provided in (b) or (c) of this subdivision, any expenditure which might generally be considered either for a gift or entertainment, or considered either for travel or entertainment, shall be considered an expenditure for entertainment rather than for a gift or travel. (b) Expenditures deemed gifts. An expenditure described in (a) of this subdivision shall be be deemed for a gift to which this section does not apply if it is: (1) An expenditure for packaged food or beverages transferred directly or indirectly to another person intended for consumption at a later time. See also sec. 1.274-3(a) and (b), Income Tax Regs.[22] *288 While we believe it likely that some of Ball's activities might not have fallen within the mantle of "entertainment" as used in the Code and defined in the regulations, petitioner has given us no evidence upon which one activity could be segregated from the other. The evidence with respect to Ball's activities was general and gave us the impression that his activities consisted primarily of "communication" by means of "entertainment" to which section 274 is applicable. Under the circumstances we must sustain respondent's disallowance of the "extraordinary employee business expenses" attributable to Ball. And we have insufficient evidence to overcome the presumption of correctness of respondent's disallowance of the remainder of these expenses except for certain expenses attributable to Ross. We do not believe, however, that the offerings paid to the ministers with whom Ross met can be characterized as entertainment, amusement, or recreation, nor did they constitute gifts subject to the strictures of section 274. Quite simply, each payment was made *289 to compensate the minister for his time spent in talking with Ross, and as such, the payment is not an "* * * item excludable from gross income of the recipient under section 102 which is not excludable * * * under any other provision of this chapter * * *." Sec. 274(b)(1). Since petitioner has not more precisely established how much of the approximately $250,000 expended by Ross is allocable to offerings, we have determined, taking into account the increase in participating church groups and assuming a maximum of 30 visits per week in 1970 and 1971, that petitioner is entitled to ordinary and necessary business expense deductions in the following amounts: [23]
1968
$10,000
1969
25,000
1970
37,500
1971
37,500
See Cohan v. Commissioner,39 F. 2d 540 (2nd Cir. 1930). Having found that, except for the offerings paid by Ross, the "extraordinary employee expenses" in issue are expenditures to which section 274 applies, *290 we now consider whether petitioner has satisfied the substantiation requisites of section 274(d).
Petitioner must establish the prescribed elements of proof, [24] *291 and he must do so by either "adequate records" or "sufficient evidence corroborating his own statements." At trial, however, petitioner acknowledged that if we found the "extraordinary employee expenses" to be subject to section 274, he would be unable to substantiate the expenses as required by section 274(d). Reviewing the record, we agree that the nature and form of the evidence presented fall short of that required. See sec. 1.274-5(c)(2) and (3), Income Tax Regs. Briefly, petitioner presented none of the expense sheets submitted by Ball and Ross *292 nor their appointment records from which we might glean elements of proof. We were given none of the details of the meetings attended by Ball and Ross as to time, place, persons attending and business discussed. We have only the general testimony of Ball and Ross that they hosted meetings attended by various members of the union or church groups. None of those attending these meetings was called as a witness, nor do we have evidence of the precise amounts spent at any of these meetings. Clearly, the cancelled checks to which the parties have stipulated do not constitute "adequate records." See Mathews v. Commissioner,61 T.C. 12, 25-26 (1973), revd. on other grounds 520 F. 2d 323 (5th Cir. 1975), cert. denied 424 U.S. 967 (1976). And further, the general testimony of petitioner, Ball, and Ross fails to otherwise establish by corroboration the requisite elements of proof. Accordingly, we uphold respondent's determination on this issue except for the offerings we have determined made by Ross.
Similarly, we believe petitioner has failed to adequately substantiate the various deductions claimed in 1968, 1969, and 1970 for petitioner's business travel and entertainment expenses. For *293 those [25] which petitioner reported on schedule C for each of the 3 years, petitioner has established payment of a substantial number of bills for 1968 and 1969 which show the amount, date, and place of entertainment. Other than petitioner's general assertions that he traveled to meet with group program participants and frequently went to the firm branch offices, petitioner presented no evidence to substantiate the expenditures for 1970 nor as to the elements of business purpose and business relationship required to prove the expenditures for 1968 and 1969. With regard to the itemized deductions claimed by petitioner for business entertainment in each of the 3 years, [26] *294 petitioner testified that he hosted approximately two parties each year for the leadership of the various participating groups. This general testimony clearly fails to satisfy the evidentiary requisites of section 274(d) and the regulations thereunder at section 1.274-5(b)(3), supra. Recognizing the inadequacy of his records, petitioner asserts that the chaos caused by his personal legal problems and incarceration warrants application of the exception provided by section 1.247-5(c)(5), Income Tax Regs.[27] Petitioner's reliance thereon is misplaced. At the outset, we doubt that petitioner's books and records were in fact lost since petitioner did make certain of his books and records available to respondent's agents. Indeed, at trial, petitioner adverted to the cartons of records, albeit disordered, which he had in his possession. Furthermore, the testimony offered by petitioner fails to meet the "reasonable reconstruction" standard required if we were to apply the exception. More importantly, we do not regard the circumstances of petitioner's legal difficulties as circumstances beyond petitioner's control as prescribed by the regulation. Cf. Gizzi v. Commissioner,65 T.C. 342 (1975). Such circumstances may have been disastrous, but not a casualty. Thus, we hold that petitioner has failed to substantiate the abovespecified business expenses in issue for 1968, 1969, and *295 1970 and is accordingly not entitled to deductions therefor. The next issue involves respondent's disallowance of $21,482.55 which petitioner claimed as an interest expense deduction in 1969. Petitioner predicates his position on the agreement between himself and his creditor whereby for 1969 payments by petitioner pursuant to preexisting promissory notes were to be considered interest; accordingly, petitioner argues that he is entitled to an interest expense deduction under section 163 for the $21,482.55 paid in 1969. Respondent relies on his authority under section 446(b) and asserts that the deduction resulted in a material distortion of petitioner's income sufficient to warrant its disallowance. [28] *296 We dismiss at the outset petitioner's contention that respondent is precluded by the stipulation from challenging the deduction. Respondent stipulated that the promissory notes were executed for a legitimate business purpose; respondent did not stipulate that the payments pursuant thereto were for a legitimate business purpose or otherwise proper. Turning to the merits, we do not accord the agreement between petitioner and his creditor the tax effect urged by petitioner.Petitioner testified to no purpose for the arrangment other than tax savings, nor can we discern any. The fact that the creditor included the $21,482.55 as income on his 1969 income tax return is irrelevant to the proper characterization of the payment for our purposes herein. In short, the agreement is devoid of substantive *297 business purpose, cf. Gregory v. Helvering,293 U.S. 465 (1935), and therefore ineffective to achieve the alchemy sought by petitioner. The $21,482.55 paid constitutes principal, as it was apparently subsequently regarded when the notes were paid off, and as such, nondeductible. Having so concluded, we do not address the accounting aspects of respondent's approach under section 446(b). We now take up the question of whether the cost of the trailer purchased in 1969 by petitioner for use as the firm's branch office in Santa Ana may, as petitioner claims, [29] be deducted in full as a business expense under section 162(a) or whether, as respondent maintains, the cost constitutes a capital expenditure, deduction of which is proscribed by section 263. As indicated by section 1.263(a)-2, Income Tax Regs., *298 which includes as an example of capital expenditures "(a) The cost of acquisition, construction, or erection of buildings, machinery and equipment, furniture and fixtures, and similar property having a useful life substantially beyond the taxable year," the distinction between a current expense and a capital expenditure depends, in general, upon a determination of useful life. Cf. sec. 1.162-6, Income Tax Regs.
As defined in section 1.167(a)-1(b), Income Tax Regs., useful life is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income. This period shall be determined by reference to his experience with similar property taking into account present conditions and probable future developments. Some of the factors to be considered in determining this period are (1) wear and tear and decay or decline from natural causes, (2) the normal progress of the art, economic changes, inventions and current developments within the industry and the taxpayer's trade or business, (3) the climatic and other local conditions peculiar to the taxpayer's *299 trade or business, and (4) the taxpayer's policy as to repairs, renewals, and replacements.* * * Thus, useful life focuses on the functional adequacy of an asset in the particular context of the taxpayer's trade or business. See Massey Motors, Inc. v. United States,364 U.S. 92, 96 (1960). Accordingly, the intent of the taxpayer at the time of acquisition is a relevant factor in determining an asset's useful life. Herein, petitioner asserts that irrespective of what the useful life of the trailer might ordinarily be, its useful life to him was less than a year. The trailer was intended only as a temporary facility since petitioner expected to construct a permanent office on the Santa Ana site within a year. Although petitioner predicates his position on intent, he has not provided sufficient indicia of that intent to persuade us that the trailer was in fact intended for temporary use of short duration. Petitioner presented no evidence, for example, as to architectural or construction plans commissioned or undertaken, financing arrangements, or prior instances where similar temporary accommodations were used, which might tend to corroborate petitioner's intended use of the trailer. *300 Indeed, the record reveals facts which militate against petitioner's purported intent: In petitioner's books, the trailer was treated as a capital asset for which a depreciation account was established; the trailer was not in fact sold until 1972, and on his income tax return for 1972, petitioner claimed (and was allowed) a loss on the sale, the computation of which loss reflected depreciation previously allowed (or allowable) in the amount of $1,271. In sum, we find no fixed intent held by petitioner as to the temporary use of the trailer, but rather an indefinite expectation or possibility, which, as such, is insufficient to establish the useful life urged by petitioner. Cf. Dunn v. Commissioner,42 T.C. 490, 495 (1964); Stevens Pass, Inc. v. Commissioner,48 T.C. 532, 541 (1967). Moreover, even were we to find that petitioner intended to use the trailer temporarily pending construction of a permanent facility within a year, it does not necessarily follow that the trailer lacked a useful life beyond the taxable year. That petitioner intended to discontinue the use of the trailer as an office is not to say that the trailer, which was movable and of apparently standard design, *301 could not have otherwise been useful in petitioner's business.
Nor do we regard the trailer as the type of item which this Court has previously recognized as sufficiently temporary to warrant a current deduction therefor. Compare, e.g., Mennuto v. Commissioner,56 T.C. 910 (1971) (cost of leeching pit designed to be functional for approximately 1 year held properly deductible); Buedingen v. Commissioner,6 B.T.A. 335 (1927) (expenditures for temporary partitions, roofing, and other fixtures used to initially finish newly constructed facility held properly deductible). We conclude that petitioner is not entitled to deduct the cost of the trailer as a business expense under section 162(a), but must instead capitalize the $40,600 expended. Since petitioner has presented no evidence to establish specifically a useful life for the trailer other than that determined by respondent (40 years), nor a method of depreciation other than the straight line method applied by respondent, we must sustain respondent's determinations on this issue. The essence of the controversy as to the amount and character of the gain, if any, that petitioner realized in 1972 from the sale of his law practice involves *302 the consideration received by petitioner. Contrary to respondent's determination of an ordinary gain in the amount of $29,916.36, petitioner contends that he realized a loss on the sale since he in fact received virtually none of the payments prescribed by the agreement of August 18, 1972, as amended. Before turning to our analysis of the constitutent elements of what we have determined to be the correct computation, we preface our consideration by noting not only that the record is rather confusing and unclear on the disputed elements but also, and more importantly, that nowhere do the parties make explicit the method of accounting upon which their respective computations are based. The parties appear, however, to assume throughout that petitioner was a cash basis taxpayer; accordingly, we predicate our analysis on that assumption. On the basis of the computation and explanation below, we find that in 1972 petitioner realized a gain of $19,144.34 as a result of the sale of his law practice. In so determining, we find that notwithstanding the sales price of $200,000 specified in the agreement, the consideration received by petitioner includable as the amount realized under section *303 1001(b) is $192,084.34. The original agreement of August 18, 1972, provided for a cash payment of $40,000; however, the October 1, 1972 amendment substituted the sum of $25,000 in lieu of payments to petitioner under both the business and property agreements, which amounts were $40,000 and $2,143.64, respectively. Netting the $25,000 by the $2,143.64 relating to the property agreement, respondent arrived at the $22,856.36 which he used in his computation of the gain on the sale of the law practice.We believe respondent's approach is defective for two reasons: One, assuming that $25,000 is the proper amount to be substituted, respondent reduced it by the actual, instead of the proportional, amount attributable to the property agreement; and secondly, the total amount to be substituted is $18,000 rather than $25,000. Although $25,000 was the face value of the note received by petitioner, it is the fair market value thereof which petitioner, as a cash basis taxpayer, must include as the amount realized. Cf. Warren Jones Company v. Commissioner,524 F. 2d 788 (9th Cir. 1975), revg. and remanding 60 T.C. 663 (1973). The fair market value we find to be $18,000, the amount for which petitioner *304 actually sold the note. Of this $18,000, the proportionate amount allocable to the sale of petitioner's law practice is $17,084.34. Also includable in the amount realized by petitioner are the liabilities assumed by the purchasers. Cf. Crane v. Commissioner,331 U.S. 1 (1947). Smith v. Commissioner,324 F. 2d 725 (9th Cir. 1963), affg. a Memorandum Opinion of this Court. Accordingly, the $113,000 of liabilities assumed under the original business agreement, the additional liabilities of $20,000 assumed pursuant to the amendment of October 1, 1972, and the specific liability of $42,000 to David Silverton [30] *305 also assumed under the original agreement all constitute amounts realized by petitioner. Thus we have calculated the amount realized by petitioner to be $192,084.34.We do not include, as did respondent, the "$5000 payable to Silverton Law Corp." specified in the agreement of August 18, 1972. As a contractual obligation, unaccompanied by a note, it is not includable as an amount realized by petitioner, a cash basis taxpayer. Cf. Ennis v. Commissioner,17 T.C. 465 (1951). [31]
There is no dispute as to the adjustments of $39,824.24 ("assumption of seller's debts paid by seller") and $73,173.76 ("business payable paid by purchaser"), both of which reduce the sales price to $79,084.34. Petitioner claims that he is entitled to a further reduction for the amount of $37,587.57 paid by David Silverton on the loan to Western Mortgage Corp., because the money came from petitioner's law practice. Thus, petitioner argues, the payment should be treated as a selling expense paid by him. From the vague and inconclusive record before us, we can draw no such conclusion. While we recognize that both agreements of August 18, 1972, were "* * * not efficacious unless the sum of $40,000.00 is delivered to David Silverton (for use in curing the delinquency on the promissory note secured by the first trust deed on the building at 3630 Wilshire Blvd.) * * *," it is not at all clear who was obligated to provide the funds to be delivered to David Silverton. In the absence of proof on the matter, we reject *306 the adjustment sought by petitioner. Respondent has allowed petitioner a basis ("loans to clients") in the amount of $59,940. This figure reflects disallowed case preparation and litigation expense deductions of $38,921 for 1971 and $21,019 for 1972. Since we have upheld respondent's determinations with regard to the case preparation and litigation costs, we accordingly accept the basis figure derived therefrom. Thus, we conclude that petitioner realized a gain of $19,144.34 from the sale of his law practice which amount is properly includable in petitioner's income for 1972. Petitioner contends that any gain realized is attributable to the sale of goodwill, hence capital in character. We disagree; petitioner has failed to establish both that goodwill in fact existed as an asset of the law practice and that such goodwill had a value sufficient to warrant allocation of a portion of the sales price thereto. While the absence of any specific provision for goodwill in the business agreement, as amended, does not of itself preclude the existence of goodwill, Copperhead Coal Company v. Commissioner,272 F. 2d 45 (6th Cir. 1959), affg. a Memorandum Opinion of this Court, Wilmot Fleming Engineering Co. v. Commissioner,65 T.C. 847 (1976), *307 such fact, without any indication that goodwill was considered in the negotiations for the sale of the law practice, militates against a finding of goodwill. While we express no opinion on the operative effect of the document signed by Reeks on February 9, 1973 ("CLARIFICATION OF AGREEMENT 8/18/72"), the reference therein to a covenant not to compete further disparages the existence of goodwill. Indeed, the purported covenant supports our belief that the firm's substantial clientele resulted in large measure from the abilities, experience, and other personal attributes of petitioner, which, as such, are not transferable. In view of this factor, we cannot find the expectation of continued patronage that enables the purchasers to succeed to the advantageous position of the seller which we have previously recognized to be necessary for the existence of goodwill.See, e.g., Carty v. Commissioner,38 T.C. 46 (1962); Estate of Maddock v. Commissioner,16 T.C. 324 (1951); Wilmot Fleming Engineering Co. v. Commissioner,supra.Petitioner's emphasis on the continued use of the firm's telephone number is insufficient to establish the requisite transferable advantage. Moreover, even were we *308 to find that goodwill was transferred as part of the sale of the law practice, petitioner proffered no evidence to establish the value thereof. In the absence of any such evidence, and in view of the countervailing effects of petitioner's personal legal problems, we will not indulge in speculation on petitioner's behalf. We therefore uphold respondent's determination that the gain realized upon the sale was ordinary in character. Turning to the next issue raised by the parties, we must decide whether in 1972 there was a completed sale by petitioner of certain property at 3630 Wilshire Blvd.Determination of when a sale occurs is a question of fact to be resolved according to the instant circumstances. Clodfelter v. Commissioner,426 F. 2d 1391, 1393-1394 (9th Cir. 1970), affg. 48 T.C. 694 (1967); Commissioner v. Segall,114 F. 2d 706, 709-710 (6th Cir. 1940), revg. on other grounds 38 B.T.A. 43 (1938), cert. denied 313 U.S. 562 (1941); Harmston v. Commissioner,61 T.C. 216 (1973), affd. per curiam 528 F. 2d 55 (9th Cir. 1976). See also Deyoe v. Commissioner,66 T.C. 904, 910 (1976). As articulated by the court in Commissioner v. Segall,supra at 709-710: There are no hard and fast *309 rules of thumb that can be used in determining, for taxation purposes, when a sale was consummated, and no single factor is controlling; the transaction must be viewed as a whole and in the light of realism and practicality. Passage of title is perhaps the most conclusive circumstance. * * * Transfer of possession is also significant. * * * A factor often considered is whether there has been such substantial performance of conditions precedent as imposes upon the purchaser an unconditional duty to pay. * * * [Cits. omitted.] Applying these criteria to the instant case, there is ample evidence to establish a sale of the property as provided in the agreement of August 18, 1972. By the deed dated September 12, 1972, title passed from petitioner to the purchasers. There appears to be no dispute as to the transfer of possession, the occurrence of which is corroborated in the letter of February 15, 1973, to Reeks by petitioner's reference to "* * * the more than six months that you occupied the premises [3630 Wilshire Blvd.] * * *." To the extent the sale was conditioned upon the delivery of $40,000 to David Silverton to cure the delinquency on petitioner's note to Western Mortgage *310 Co., that condition was substantially satisfied by the aforementioned payments on August 21 and 23, 1972. In short, we find that petitioner transferred and the buyers assumed the requisite incidents of ownership. Moreover, the deeds to Harvey Sklar dated January 27, 1973, afortiori, indicate that the property was conveyed to the purchasers in the first instance. Thus, we reject petitioner's contention that the sale was not consummated. The asserted failure of the buyers to discharge the obligations specified in the property agreement of August 18, 1972, while perhaps evidence of a breach of the contract, does not render the sale incomplete. Nor does the fact that in December 1972 petitioner initiated discussions for the reacquisition of the property of itself vitiate the completed character of the transaction. Cf. Hope v. Commissioner,55 T.C. 1020 (1971), affd. 471 F. 2d 738 (3d Cir. 1973), cert. denied 414 U.S. 824 (1973). In this regard, we note also that the record before us precludes any attempt by petitioner to argue that a reconveyance of the property was effectuated prior to the close of 1972. As to the furniture and/or fixtures that are the subject of derivative *311 issues involving depreciation and loss deductions (see fn. 4, supra), we further find, on the basis of both the quitclaim contained in the document executed by petitioner on January 27, 1973, and the subsequent reference in petitioner's letter of February 15, 1973, to the personal property, that these disputed items were included in the property sold by petitioner pursuant to the property agreement of August 18, 1972. Petitioner raises the alternative argument that if there were a sale in 1972, he nevertheless realized no gain therefrom since he was insolvent. Suffice it to say that petitioner introduced no evidence to establish his asserted insolvency; accordingly, we dismiss without consideration petitioner's arguments predicated thereon. Specifically with regard to the amount of gain realized by petitioner from the sale of his property, we believe minor adjustments in respondent's computation, supra, are necessary. Respondent has included as consideration "payments by purchaser" in the amount of $3,567.57. This figure is apparently composed of two separate amounts: $1,423.93 and $2,143.64. This latter amount is, however, one of the payments for which the note specified in *312 the amendment of October 1, 1972, was to be substituted. Consistent with the approach taken above in respect of the proportionate amount of the fair market value of the note ($17,084.34) which we substituted for the payment prescribed pursuant to the business agreement of August 18, 1972, we find that $915.66, rather than $2,143.64, is the proper amount to be added with the $1,423.93 for a total of $2,339.59. Any other adjustments to reflect the stipulations relating to the basis of furniture and fixtures will be accounted for in the Rule 155 computation. Subject to the adjustments mentioned above, we approve respondent's determination that petitioner realized a gain on the sale of the building property and the furniture and fixtures in 1972 and the amount thereof. Lastly, we consider the imposition of the addition to tax asserted by respondent under sections 6653(a) (negligence) and 6651(b) (late filing). In respect of the former, respondent determined that petitioner's failure to keep adequate books and records as required for substantiation of expenses under section 274 was due to negligence and intentional disregard of rules and regulations. In essence, respondent equates petitioner's *313 lack of substantiation with negligence or intentional disregard of rules and regulations. We regard section 274(d) as a standard of proof, not a standard determinative of negligence or intentional disregard. As discussed, supra, petitioner failed to present evidence sufficient to establish the deductibility of what otherwise might be allowable expenses. Such failure, while requiring disallowance of those expenses, does not of itself constitute negligence or intentional disregard of rules and regulations. In short, petitioner did maintain some books and records, which, although inadequate to comply with the substantiation requirements of section 274, were not so inadequate as to render him liable for the addition to tax asserted by respondent under section 6653(a). Robinson v. Commissioner,51 T.C. 520, 541-2 (1968), affd. (but vacated and remanded for recomputation of deficiency) 422 F.2d 873 (9th Cir. 1970). We so hold. With regard to the addition to tax asserted by respondent pursuant to section 6651(a) for petitioner's failure to file a timely return for 1972, we note that petitioner's 1972 return, which was required to be filed on or before April 15, 1973, was not in fact filed *314 until February 5, 1974.We find petitioner's attempted justification therefor--that he believed no tax was due for 1972--to be wholly without merit. Under section 6012(a)(1)(A), it is gross income, not taxable income or liability therefor, which determines whether a return is required. We find that petitioner has not shown his failure to file timely for 1972 was due to reasonable cause and not due to willful neglect; accordingly, we hold that petitioner is liable in 1972 for the addition to tax under section 6651(a). Decisions will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect in the years at issue.↩
2. Resolution of issues (1) and (2) will in turn determine whether petitioners incurred a net operating loss in 1971 in excess of $66,943 which amount respondent concedes is available to petitioners as a carryback to the years 1968, 1969, and 1970. ↩
3. See fn. 2, supra.↩
4. Dependent on whether a sale of the above-specified property occurred in 1972 are two derivative issues: Whether petitioners are entitled to an entire year's depreciation for 1972 on that property and whether petitioners sustained a loss on that property in 1973, which loss would result in a net operating loss for 1973 in excess of the $6,709 that respondent determined was available as a carryback to 1970. 5. Petitioner offered no evidence with respect to, and did not mention on brief, certain issues raised in the pleadings and mentioned by respondent on brief; we assume petitioner has conceded those issues.↩
6. For each of the taxable years 1968 and 1969, B. Silverton timely filed an individual income tax return (in her maiden name Brunhilde Goerlich). These returns are relevant to the application of the net operating loss carrybacks from 1971 to which petitioners may be entitled and have accordingly been stipulated into evidence.↩
7. In certain instances, the firm is referred to as the Silverton Law Corp. Since each schedule C accompanying petitioner's income tax returns for the years in issue reports the firm's name as Silverton & Silverton and that it was owned by petitioner, we have therefore treated the law firm as a sole proprietorship and do not understand the parties contend otherwise.
8. The firm did some domestic relations, criminal defense, and probate work on a fixed-fee basis in accordance with the appropriate local bar association's minimum fee schedule. For participants in the group programs, these fees were approximately 20 percent less than those for clients who were not part of a group plan.↩
9. Interestingly, neither party has mentioned the method of accounting used by petitioner in computing his business profit (or loss). We note, however, that the schedule C accompanying petitioner's return for 1968 designates the accrual method, those for 1969 and 1970, the cash basis method, and those for 1971 and 1972, the accrual method.↩
10. On the returns, these amounts were not labelled "Extra-ordinary Employee Expenses" but instead were reported as "commissions," "fees," or "other business expenses."↩
11. Ball and Ross were the primary, but not sole, liaison person; there was, for example, another employee who served as a liaison with Filipinio groups.↩
12. Petitioner's books for 1969 apparently reflected a payment of principal of approximately $21,000, which amount was also considered principal in 1971 when the promissory notes were paid off. Petitioner's creditor reported the $21,482.55 received as interest income on his 1969 income tax return.↩
13. Silverton v. State Bar,121 Cal. Rptr. 596, 535 P. 2d 724↩ (1975).
14. In the statutory notice, respondent determined gain of $51,060, which amount respondent concedes should be reduced to $29,916.36. For simplicity, we have followed the approach taken by respondent on brief and further identified the constituent elements of his computation. 15. These two adjustments are as stipulated by the parties.↩
16. All of these additions were computed by reference to the respective deficiencies as originally determined by respondent.↩
17. Were this a matter of first impression the writer would be more dubious about whether these advances should be characterized as loans because the writer fails to find any obligation on the part of the client to repay. The attorney looks only to the amounts recovered for repayment. Also in an operation as extensive as petitioner's in this case, where literally thousands of clients' ledger cards are involved each year, it would be very difficult to determine accurately which cases were lost or abandoned as of the end of a particular year, and petitioner's method of accounting for the advances would probably more clearly and accurately reflect the income of the law firm. Over a period of years, if there is no change in ownership, the overall result should be the same under both methods, but such was not the case here, and it would have been an almost impossible task for the revenue agent to analyze all the client ledger cards as of the end of each year here involved. Nevertheless, we feel bound to follow the prior opinions of this Court under almost identical circumstances and the decisions of the Ninth Circuit, to which an appeal in this case would lie. See Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F. 2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940↩ (1971).
18. SEC. 274. DISALLOWANCE OF CERTAIN ENTERTAINMENT, ETC., EXPENSES. (a) Entertainment, Amusement, or Recreation.-- (1) In general.--No deduction otherwise allowable under this chapter shall be allowed for any item-- (A) Activity.--With respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, unless the taxpayer establishes that the item was directly related to, or, in the case of an item directly preceding or following a substantial and bona fide business discussion (including business meetings at a convention or otherwise), that such item was associated with, the active conduct of the taxpayer's trade or business, or (B) Facility.--With respect to a facility used in connection with an activity referred to in subparagraph (A), unless the taxpayer establishes that the facility was used primarily for the furtherance of the taxpayer's trade or business and that the item was directly related to the active conduct of such trade or business, and such deduction shall in no event exceed the portion of such item directly related to, or, in the case of an item described in subparagraph (A) directly preceding or following a substantial and bona fide business discussion (including business meetings at a convention or otherwise), the portion of such item associated with, the active conduct of the taxpayer's trade or business. * * *
(b) Gifts.-- (1) Limitation.--No deduction shall be allowed under section 162 or section 212 for any expense for gifts made directly or indirectly to any individual to the extent that such expense, when added to prior expenses of the taxpayer for gifts made to such individual during the same taxable year, exceeds $25. For purposes of this section, the term "gift" means any item excludable from gross income of the recipient under section 102 which is not excludable from his gross income under any other provision of this chapter, but such term does not include-- * * *↩
19. (d) Substantiation Required.--No deduction shall be allowed-- (1) under section 162 or 212 for any traveling expense (including meals and lodging while away from home), (2) for any item with respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, or with respect to a facility used in connection with such an activity, or (3) for any expense for gifts, unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such expense or other item, (B) the time and place of the travel, entertainment, amusement, recreation, or use of the facility, or the date and description of the gift, (C) the business purpose of the expense or other item, and (D) the business relationship to the taxpayer of persons entertained, using the facility, or receiving the gift. The Secretary * * * may by regulation provide that some or all of the requirements of the preceding sentence shall not apply in the case of an expense which does not exceed an amount prescribed pursuant to such regulations.↩
20. Although adverted to by respondent on reply brief, the parties do not specifically address the question of qualification under section 162(a), the threshold requisite for deduction of the extraordinary employee expenses. Nor do the parties focus on whether the liaison activities satisfy the "directly related to" or "associated with" criteria of section 274(a).↩
21. See also Rev. Rul. 63-144, 1963-2 C.B. 129↩, particularly the question and answer for numbers 7, 8, 15, and 16 as well as the reference in question 17 to "business meal entertaining."
22. Sec. 1.274-3. Disallowance of deduction for gifts.--(a) In general. No deduction shall be allowed under section 162 or 212 for any expense for a gift made directly or indirectly by a taxpayer to any individual to the extent that such expense, when added to prior expenses of the taxpayer for gifts made to such individual during the taxpayer's taxable year, exceeds $25. (b) Gift defined--(1) In general. Except as provided in subparagraph (2) of this paragraph the term "gift", for purposes of this section, means any item excludable from the gross income of the recipient under section 102 which is not excludable from his gross income under any other provision of chapter 1 of the Code. * * *
23. In framing this issue in terms of the applicability of section 274, respondent has, afortiori,↩ acknowledged that these expenses are otherwise deductible under section 162. Petitioner makes no claim that the offerings are deductible under section 170 as charitable contributions.
24. In respect of entertainment and gifts, sec. 1.274-5(b). Income Tax Regs., specifies: (b) Elements of an expenditure-- * * * (3) Entertainment in general. Elements to be proved with respect to an expenditure for entertainment are-- (i) Amount. amount of each separate expenditure for entertainment, except that such incidental items as taxi fares or telephone calls may be aggregated on a daily basis; (ii) Time. Date of entertainment; (iii) Place. Name, if any, address or location, and designation of type of entertainment, such as dinner or theater, if such information is not apparent from the designation of the place; (iv) Business purpose. Business reason for the entertainment or nature of business benefit derived or expected to be derived as a result of the entertainment and, except in the case of business meals described in section 274(e)(1), the nature of any business discussion or activity; (v) Business relationship. Occupation or other information relating to the person or persons entertained, including name, title, or other designation, sufficient to establish business relationship to the taxpayer. * * *
(5) Gifts. Elements to be proved with respect to an expenditure for a gift are-- (i) Amount. Cost of the gift to the taxpayer; (ii) Time. Date of the gift; (iii) Description. Description of the gift; (iv) Business purpose. Business reason for the gift or nature of business benefit derived or expected to be derived as a result of the gift; and (v) Business relationship↩. Occupation or other information relating to the recipient of the gift, including name, title, or other designation sufficient to establish business relationship to the taxpayer.
25. The deductions claimed and amounts disallowed are, as indicated in our findings, supra: ↩ Year
Expenses claimed
Amount disallowed
1968
$12,506.00
$ 7,460.48
1969
19,894.00
11,785.54
1970
7,622.00
6,172.27
26. Petitioner claimed deductions of $2,601.97 in 1968, $2,000 in 1969, and $3,200 in 1970, all of which respondent disallowed in full.
27. Sec. 1.274-5(c)(5), Income Tax Regs., provides: (5) Loss of records due to circumstances beyond control of the taxpayer↩. Where the taxpayer establishes that the failure to produce adequate records is due to the loss of such records through circumstances beyond the taxpayer's control, such as destruction by fire, flood, earthquake, or other casualty, the taxpayer shall have a right to substantiate a deduction by reasonable reconstruction of his expenditures.
28. Respondent captioned his argument on this issue "The deduction of pre-paid interest in the year of payment by taxpayer employing the cash-method of accounting is not allowable if a material distortion of income has resulted." Although the parties have not established the method of accounting used by petitioner, see fn. 9, supra,↩ they have apparently proceeded on the assumption that petitioner was a cash basis taxpayer.
29. This is the position taken by petitioner at trial and on brief. We note, however, that the respective petitions filed in docket No. 8906-72 and docket No. 8907-72 assert that petitioner inadvertently expensed the cost of the trailer and further claim that the trailer, as a temporary facility, had a useful life of 5 years and that petitioner was entitled to use the double-declining balance method of depreciation.↩
30. The fact that David Silverton, the creditor, and Reeks thereafter on February 9, 1973, agreed to a modification of the amount payable does not diminish the amount realized by petitioner upon the assumption of the debt. 31. See also Hale v. Commissioner,T.C. Memo. 1966-163↩.