Karl and Hilda HOPE, Appellants in
Nos. 71–1993, 71–1994,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Appellant in No. 71–1995.

Nos. 71–1993 to 71–1995.

United States Court of Appeals,
Third Circuit.

Argued Oct. 16, 1972.

Decided Jan. 9, 1973.

Jules I. Whitman, Dilworth, Paxson, Kalish, Levy & Coleman, Philadelphia, Pa., for appellants in Nos. 71–1993, 71–1994 and appellees in No. 71–1995.

Elmer J. Kelsey, Department of Justice-Tax Division, Washington, D. C., for appellant in No. 71–1995 and appellees in Nos. 71–1993 and 71–1994.

Before GIBBONS and JAMES ROSEN,* Circuit Judges, and LAYTON, District Judge.

OPINION OF THE COURT

GIBBONS, Circuit Judge.

The taxpayers, Karl and Hilda Hope, appeal from a decision of the United States Tax Court, 55 T.C. 1020, determining a deficiency in income tax for the taxable year 1960 in the amount of $985,459.00. The Commissioner has filed a protective appeal from the Tax Court decision determining an overpayment of $137,775.00 in the year 1961. Taxpayer has filed a cross appeal with respect to the year 1961.

The taxpayers have filed calendar year tax returns on the cash receipts and disbursements method of accounting.

* Judge Rosen participated but died before the opinion was filed.

Prior to the years in issue Karl Hope was the sole stockholder of Perfect Photo, Inc. In 1959 a public offering of 150,000 shares of Perfect Photo stock was made at $14.00 a share. Of these shares 90,000 were sold by Karl Hope, and 60,000 by the corporation. This left 210,000 shares in Hope's hands. He sold 3,600 shares in January, 1960, at $37.11 a share, and during 1960 he expressed an interest in selling his remaining 206,400 shares. At that time Perfect Photo employed Karl Hope's brother, Henry Hope, as a vice-president in charge of technical aspects of the business. It also employed Warren G. Grabb, a management engineer, and Henry J. Sentiff, a certified public accountant, both of whom were engaged in the company's financial affairs. The company stock was then traded on the American Stock Exchange.

Sentiff approached Harriman Ripley and Company, Inc. of New York, (Harriman Ripley) an underwriter of securities, about financing the purchase of Karl Hope's 206,400 shares. He then obtained from Karl Hope an agreement granting Sentiff and Grabb the right, for a period of thirty days from June 15, 1960, to purchase the 206,400 shares for $4,000,000.00. However, Sentiff was then advised by Harriman Ripley that Federal Reserve Board margin regulations, limiting loans for purchase of securities, would prevent its financing of the purchase by Sentiff and Grabb. As an alternative Harriman Ripley proposed that it purchase the 206,400 shares, at a price of $19.38 per share, for a total of $4,000,032.00, and that it give Sentiff and Grabb options until December 31, 1961, to purchase 75% of the acquired stock at the same price. Sentiff told Karl Hope that Harriman Ripley would purchase his stock, but at that time did not mention the options.

On June 25, 1960, the details of the purchase arrangement including the options to Sentiff and Grabb, were made known by Harriman Ripley to the attorney for Karl Hope, who was also general counsel, secretary, and a director of Perfect Photo. The attorney was informed that Karl Hope could not be included as an optionee without risking violation of the Federal Reserve Board margin regulations. A meeting then took place between Karl Hope, his brother Henry, Sentiff and Grabb, during which Karl Hope learned that Sentiff and Grabb were to benefit from the transaction by virtue of their options, and that he could not share in those benefits because of the margin regulations. At the meeting it was agreed that Henry Hope would be included as an optionee for 77,400 shares.

On July 15, 1960, Karl Hope, in the presence of his attorney, executed a contract to sell to Harriman Ripley, for its own account and as agent for other purchasers, 206,400 shares of Perfect Photo stock for $19.38 a share. Karl Hope's obligation to complete the sale was conditioned upon the delivery by Harriman Ripley of options and proxies to Henry Hope for 77,400 shares, to Sentiff for 38,700 shares and to Grabb for 38,700 shares, all at $19.38 a share. Karl Hope attended the closing on July 27, 1960, with his attorney. All the conditions of sale having been met, including the delivery of the options and proxies to Henry Hope, Sentiff and Grabb, Karl Hope transferred 206,000 shares of Perfect Photo stock to Harriman Ripley and received checks totaling $4,000,032.00.

During June and July, 1960, Perfect Photo stock traded on the American Stock Exchange between a low of $40½ and a high of $66⅞ per share. In September, 1960, an article appeared in *Business Week* stating that Karl Hope had sold his Perfect Photo stock for $20 a share when it was trading at over $50 a share. He then became dissatisfied with the transaction, and consulted a new attorney. On that attorney's advice he maintained the proceeds of sale in liquid position, as cash in the bank, $2,369,000.00, tax exempt municipal bonds, $1,575,000.00, and marketable common stock, $429,000.00. On his behalf his attorney attempted unsuccessfully to negotiate a rescission of the sale.

On December 21, 1960, Karl Hope filed a complaint in the United States District Court for the Eastern District of Pennsylvania against Harriman Ripley, Sentiff and Grabb, alleging a conspiracy to defraud him and seeking rescission. The complaint alleged that Henry Hope had acquiesced in a rescission and would perform such acts and execute any documents necessary to effectuate it.

The December 21, 1960 lawsuit resulted in a settlement on March 24, 1961, on these terms:

 (1) Karl Hope paid $350,000.00 to Sentiff and Grabb in consideration of their assignment to him of their options to purchase a total of 77,400 shares of Perfect Photo from Harriman Ripley. (Sentiff and Grabb had resigned as officers and directors of Perfect Photo on March 3, 1961.)

 (2) Henry Hope assigned to Karl his option to purchase 77,400 shares of Perfect Photo without receiving any consideration.

 (3) Henry Hope, Sentiff and Grabb returned the proxies for 154,800 shares of Perfect Photo stock to Harriman Ripley.

 (4) Harriman Ripley confirmed to Karl Hope that the options assigned to him by Henry Hope, Sentiff and Grabb were valid and binding instruments, and delivered to Karl proxies to vote the 154,800 shares subject to the options.

 (5) The lawsuit was dismissed with prejudice and without costs.

Thus on March 24, 1961, Karl Hope held options to repurchase 75% of the stock he had sold to Harriman Ripley on July 27, 1960, for the same price per share at which he had sold it. The options ran until December 31, 1961. During the week of the settlement, Perfect Photo stock traded at a low of $44⅝ and at a high of $48⅞. Hope's new attorney explored the possibility of a resale of the 154,800 shares at a lower price, but Harriman Ripley declined any discount off the option price. Karl Hope therefore concluded that he would hold the $3,000,024.00, the option price, until December. On December 18, 1961, he gave notice of the exercise of the options, and on December 29, 1961, in exchange for the agreed option price, received from Harriman Ripley the option stock.[1]

During 1961 Karl Hope paid his new attorney $85,000.00 in counsel fees for conducting and settling the litigation against Sentiff, Grabb and Harriman Ripley and for effectuating the delivery of the option stock on December 29, 1961.

In his 1960 tax return Karl Hope disclosed the July 27, 1960 transfer of 206,400 shares of Perfect Photo stock for $4,001,632.00 ($19.38 per share, plus $1,600.00 stock transfer tax paid by Harriman Ripley). He did not, however, include any gain in income for 1960 on the theory that the transfer was not a completed sale on which gain was "recognized" in 1960. In his 1961 tax return Karl Hope reported a sale of 51,600 shares of Perfect Photo stock and showed net proceeds from that sale of $651,578.00. The net proceeds were computed by deducting from the $4,001,632.00 received in 1960 the $3,000,054.00 paid to Harriman Ripley on the exercise of the options on December 29, 1961, and the $350,000.00 paid to Sentiff and Grabb for assignment of their options on March 24, 1961. Thus only the 51,600 shares retained by Harriman Ripley were treated as having been sold, and that sale was treated as having taken place in 1961. In computing the gain on that sale Karl Hope used his original cost basis on the 51,600 shares, increased by the counsel fee of $85,000.00 paid in 1961.

In his notice of deficiency for 1960 the Commissioner determined that the

---

1. The stock had been split 3 for 1 on July 3, 1961. Thus Harriman Ripley delivered 464,400 shares.

petitioner realized a taxable gain in 1960 on the entire 206,400 shares transferred on July 27, 1960, amounting to $3,939,712.00; and assessed a deficiency of $985,459.00. In his notice of deficiency for 1961 the Commissioner determined, as an alternative to his determination with respect to 1960, that if the sale took place in 1961 petitioner had realized a taxable gain of $986,098.00 on the sale of 51,600 shares of Perfect Photo stock.

In 1962 there occurred a severe decline in the stock market. Following that decline, during 1962 and 1963, Karl Hope sold a total of 464,340 of the option shares (154,780 shares prior to the stock split) for an average per share price of approximately $4.65 ($13.95 per share on a pre-stock split basis).[2]

In the Tax Court Karl Hope made these contentions:

1. That his tender of rescission in 1960 and an actual partial rescission in 1961 postponed the realization of gain on the sale of his stock until 1961.

2. That his tender of rescission should permit him to deduct in 1961, pursuant to Int.Rev.Code of 1954, § 1341, the amount included in his 1960 income under a claim of right because it was established after the close of the 1960 tax year that he did not have an unrestricted right to the proceeds of sale.

3. Alternatively, that there was an actual rescission in 1960 of a part of the transaction (Henry Hope's option for 77,400 shares) in 1960, and thus a sale of only 129,000 shares in 1960.

4. Alternatively, that he was induced by fraud to part with his stock in 1960, that this was an involuntary conversion within the meaning of Section 1033(a) of the Internal Revenue Code, that the repurchase of the shares from Harriman Ripley in 1961 was a repurchase of similar property, and that there was nonrecognition of gain under the Code to the extent of the repurchase. § 1033(a)(3)(A)

The Tax Court rejected each of these contentions. We affirm.

 In advancing the argument that gain on the 1960 sale to Harriman Ripley was postponed to 1961, Karl Hope acknowledges the rule generally applicable to cash basis taxpayers:

"The amount of any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period." Int.Rev.Code of 1954, § 451(a).

See Treas.Reg. § 1.451–1(a) (1957). The taxpayer here received the proceeds of sale on July 27, 1960, with no restriction as to its use or disposition. Under principles of annual accounting for tax purposes the gain resulting from a sale completed in 1960 was taxable in that year. United States v. Lewis, 340 U.S. 590, 71 S.Ct. 522, 95 L.Ed. 560 (1951); Burnet v. Sanford & Brooks Co., 282 U.S. 359, 51 S.Ct. 150, 75 L.Ed. 383 (1931).

Mr. Hope contends, however, that this generally applicable rule does not apply when in the year of the sale he files a suit for rescission and thus disclaims any right to the proceeds. He seeks to come within an exception to the claim of right doctrine, North American Oil Consolidated v. Burnet, 286 U.S. 417, 52 S.Ct. 613, 76 L.Ed. 1197 (1932), that applies when in the year of receipt a taxpayer recognizes his liability under an existing and fixed obligation to repay the amount received and makes provision for such repayment. This should not be confused with his contention that he is entitled to tax treatment under the

---

2. The resulting losses, unfortunately, could not be carried back to prior years. Int.Rev.Code of 1954, § 1212(b).

general or special rules with respect to taxpayers who have restored substantial amounts held under a claim of right. *See* Int.Rev.Code of 1954, § 1341. Rather, he first urges that in the circumstances under which he received the proceeds of sale the claim of right doctrine did not apply.

Most of the cases to which the taxpayer refers,[3] however, involve a taxpayer who in the year of receipt was under a legal liability, which he acknowledged, to make repayment. But as the Tax Court found, Mr. Hope never was under any liability in 1960 to rescind the July 27, 1960 transaction. If, after that date, the market price of Perfect Photo stock had quickly declined below $20.00 a share he could, and undoubtedly would have elected to retain the proceeds of the sale. The contingent condition precedent to rescission—repayment of the purchase price—was entirely within his control, and imposed no restriction upon his use of the funds. In these circumstances his tender of rescission did not postpone realization of the gain. Even when the taxpayer's right to hold funds is disputed by others, if he has received those funds under a claim of right without restriction as to disposition the funds are income in the year of receipt although the taxpayer may later be adjudged liable to restore their equivalent. Commissioner v. Brooklyn Union Gas Co., 62 F.2d 505 (2d Cir. 1933), aff'g 22 B.T.A. 507 (1931). Here, where both control over the funds and the decision as to seeking rescission are entirely within the taxpayer's control, is an *a fortiori case*.

Mr. Hope relies also on Guffey v. United States, 339 F.2d 759 (9th Cir. 1964). Unlike the instant case, *Guffey* involved an installment contract for the sale of a residence. Title had not passed at the time, a year after the sale, when the purchasers discovered the house had dry rot and sued to rescind the contract. The parties settled out of court, with the buyers quitclaiming to the sellers and the sellers retaining the payments already made. In the same year as the settlement, the seller resold the house, and attempted to take bad debt and capital loss deductions for that year with respect to the original installment contract. The court held that the bad debt provisions of the Code were inapplicable since the non-payment was related to the physical condition of the house, not the financial condition of the first buyer. It held that there was no capital loss because neither the purchase of the house nor the first contract of sale was entered into for profit within the meaning of Int.Rev.Code of 1954, § 165(c)(2). Taxpayer contends that this case establishes the principle that a sale in one year and a rescission in another must

3. Bates Motor Transport Lines, Inc. v. Commissioner, 200 F.2d 20 (7th Cir. 1952), aff'g 17 T.C. 151 (1951), involved a contractual obligation of an accrual basis taxpayer to refund excessive freight tariffs, an acknowledgement of overpayments and a reserve to that effect. United States v. Merrill, 211 F.2d 297 (9th Cir. 1954), involved acknowledgement by an executor in the year of receipt of an obligation to repay excess executor's commissions to an estate. Gaddy v. Commissioner, 38 T.C. 943 (1962), rev'd in part on other grounds, 344 F.2d 460 (5th Cir. 1965), involved a contractual obligation of a cash basis taxpayer to refund excessive freight tariffs, a firm renunciation by that taxpayer of any right to the excess payments and a contractual undertaking as to a method of repayment, all in the same year. Sohio Corp. v. Commissioner, 82 U.S.App.D.C. 275, 163 F.2d 590 (1947), rev'g 7 T.C. 435 (1946), involved an accrual basis taxpayer forced against its will to collect and retain state taxes over its repeated protests, and whose protests ultimately resulted in refunds. We need not consider whether *Sohio* would have been decided as it was subsequent to the enactment, in the 1954 Code, of § 1341, for it is in any event quite unlike Mr. Hope's case. Wilbur Bluff v. Commissioner, 58 T.C. 224 (1972), holds that an embezzler who acknowledges his liability for the embezzlement and in the same year allows a confession of judgment to be taken against him can thereby avoid the consequence that the embezzled funds are taxable to him in that year under James v. United States, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961).

for tax purposes be treated as a single transaction. It may be that for purposes of determining whether a capital asset has been held for business rather than for personal purposes it is appropriate to look at several transactions concerning sale of that asset in their entirety. But what is appropriate for determining the purpose for which a capital asset has been held is only remotely relevant to determining in what year a cash basis taxpayer has received the proceeds of a sale under a claim of right. The Tax Court did not find this authority supportive of Mr. Hope's position as to the taxability of the 1960 transaction, nor do we.

What we have said about taxpayer's first contention adequately disposes of his contention that he is entitled to the benefit of § 1341. That section, added to the Code in 1954, allows the deduction of an item in the year following its inclusion in income by virtue of the claim of right doctrine, when it is established after the close of the prior year that taxpayer did not in fact have an unrestricted right to the income in question. It has never been established that the taxpayer did not have an unrestricted right to receive the proceeds of sale. He was free to elect not to rescind. *See* George L. Blanton, 46 T.C. 527 (1966), aff'd per curiam, 379 F.2d 558 (5th Cir. 1967). Even if we were to treat the March 24, 1961 settlement as establishing a restriction on taxpayer's right to hold the proceeds of sale, that settlement was a subsequent event brought about by him. In such circumstances § 1341 is inapplicable. Rev.Rul. 67–48, 1967–1 Cum.Bull. 50. Moreover, even the settlement did not oblige Karl Hope to rescind the sale. It merely put in his hands, in exchange for $350,000.00, options to repurchase the stock he had sold.

The taxpayer's third contention, that at least a part of the transaction was actually rescinded in 1960, is equally untenable. If an actual rescission had taken place in 1960 it might well have been recognized for tax purposes. *See* Penn v. Robertson, 115 F.2d 167 (4th Cir. 1940). The Tax Court found, however, that no actual rescission took place with respect to the 77,400 shares of stock on which Henry Hope held an option, either in 1960 or at any other time. The stipulated facts and testimony establish that the very most that was within the power of Henry Hope in 1960 was to assign to Karl Hope the option which the former held on the stock owned by Harriman Ripley. Even such an assignment was not made until March 24, 1961. Treating the assignment tendered in 1960 as actually completed, does not convert it into a rescission, for between the date of the tender and December 29, 1961, when Karl Hope actually exercised the option, he remained free to decide to keep the proceeds of sale rather than seek return of the stock. There is simply no way to disregard the fact that on December 31, 1960, the taxpayer still held the entire proceeds of sale free of restrictions, and without liability for return.

There remains Mr. Hope's involuntary conversion contention. Here we need go no further than the factual determination of the Tax Court, amply supported in the record, that no fraud was practiced upon Karl Hope, and hence there is no basis for the application of Int.Rev.Code of 1954, § 1033.[4] The question whether the 1961 repurchase qualified under § 1033(a)(1) as a repurchase of similar property, need not be considered.[5]

The Tax Court ruled correctly that a sale took place in 1960 producing a tax-

---

4. This factual determination disposes of Mr. Hope's contention, with respect to the 1961 tax year, that the $85,000.00 legal fee is deductible as a collateral theft loss under Int.Rev.Code of 1954, § 165(c)(3), and with the theory of constructive trust which he propounded.

5. In addition the Commissioner does not contend that the repurchased stock would not qualify as "similar or related" property for § 1033(a)(1) purposes.

able gain, that a repurchase took place in 1961, and that the $350,000.00 payment to Sentiff and Grabb and the $85,000.00 legal fees were capital expenses added to the cost basis of the shares repurchased in 1961.

The decision of the Tax Court will be affirmed. Each side shall bear its own costs.