OPINION OF THE COURT
Richard W. Wallach, J.
Like Banquo’s ghost, the famous “salad oil swindle” will not down. Sixteen years after the collapse of Allied Crude Vegetable Oil Refining Corporation (Allied), it continues to generate litigation such as the case at hand.
Plaintiff (Scarburgh) brings this action to recover upon an excess marine insurance policy issued by defendant (AMMI) which is alleged by Scarburgh to cover losses sustained by it in the Allied debacle. Scarburgh asserts that at the time of Allied’s bankruptcy filed on November 19, 1963, Scarburgh was the holder for value of an excess of $23 million worth of fraudulently issued and subsequently worthless warehouse receipts taken as collateral security in vegetable oil financing transactions with Allied.
*773 1. Scarburgh’s Failure to Disclose Material Facts
Scarburgh’s right to recovery of this loss against AMMI is premised upon a fraud and crime coverage indorsement dated November 25, 1963, affixed to an original marine insurance policy dated August 28, 1963. In AMMI’s answer to Scarburgh’s amended complaint herein, AMMI has raised affirmative defenses that the indorsement was obtained under circumstances amounting to both fraud and mistake. The court now holds that defendant has successfully established its affirmative defenses of fraud and mistake by an overwhelming preponderance of credible evidence. Accordingly, it follows that plaintiff’s complaint must be dismissed, with costs.
The genesis of the insurance coverage upon which this action rests occurred on July 2, 1963 when Scarburgh’s parent company, Isbrandtsen & Co., Inc. (Isbrandtsen) was seeking a marine “bumbershoot” (Ang. umbrella) excess policy to replace one issued by British Insurers which was expiring. At that time, Isbrandtsen’s insurance matters were entirely in the hands of Frank B. Hall & Co., Inc., insurance brokers. Personally in charge of the Isbrandtsen insurance account at Hall was B. Lytton Johnston, assisted by John D. Lucey, a broker with marine risk expertise.
On July 2, 1963, Johnston and Lucey met with John Blackman, AMMI’s marine underwriter, at which time Lucey delivered to Blackman a written application for standard excess insurance marine coverage with a $10 million limit. In that application which listed several other affiliates, divisions, and subsidiaries, Scarburgh was described as a subsidiary (over 70% controlled) whose business was, as a principal or agent, the import or export of commodities, with a further reference to “short and medium term commercial finance business financing against commodities, accounts receivable, etc.” This application sought marine excess coverage over underlying hull and protection and indemnity policies pertaining to two specifically named vessels and marine time charter liability. In the course of this meeting, Johnston orally requested additional coverage for fraudulent title document insurance.
*774 At that meeting, Johnston knew but did not disclose that Scarburgh was then financing Allied against the security of warehouse receipts issued by American Express Warehousing, Ltd. (Warehousing) and Harbor Tank Storage Co., Inc. (Harbor Tank) at Bayonne, New Jersey, and that this financing activity, amounting to millions of dollars, constituted virtually the entirety of Scarburgh’s financial operations.
The July 2 meeting ended inconclusively and Johnston and Blackman then met at the latter’s office on July 23, 1963. At that time, Johnston was in possession of a memorandum dated July 5, 1963, prepared by Isbrandtsen’s president, A. S. Abdirkin, stating that over-all loans of his company secured by warehouse receipts and other title documents “now run about 25 million dollars.”
Johnston did not apprise Blackman of the volume or character of Scarburgh’s loan activity at this meeting. At that time, Blackman agreed to issue the marine excess policy, but he declined to provide any primary insurance coverage for fraudulent title document risks. AMMI’s ocean marine excess policy was dated and issued on August 28, 1963 pursuant to the earlier binder.
Prior to the next critical meeting of the insurance negotiators at Blackman’s office on Friday afternoon, November 15, 1963, certain calamitous events had occurred with respect to plaintiff’s loan transactions with Allied and the financial collapse of Allied, all of which were carefully concealed from Blackman, who did not have the slightest intimation that Scarburgh was even remotely involved with Allied. These events included:
1. Plaintiff’s loans to Allied secured by warehouse receipts were now approximately $24 million.
2. Allied was known by plaintiff and its brokers to be insolvent and unable to pay its debts. Plaintiff had knowledge that an Allied draft for $250,000 deposited the previous day would be dishonored for insufficient funds. (Even this loss, concededly known and incurred prior to the earliest conceivable attachment of defendant’s coverage, is included in plaintiff’s proof of loss and claim.)
*775 3. Anthony De Angelis, who controlled Allied, was known by plaintiff to be untrustworthy and had already caused Isbrandtsen a $466,000 loss for fraud in connection with an oil cargo shipment.
At this November 15 meeting, plaintiff was represented not only by the Hall marine expert, Lucey, but another Hall officer, Edwin G. Stephens. The day before Jacob Isbrandtsen, the board chairman of plaintiff’s parent company, had instructed Abdirkin to collect and see all the insurance policies with Abdirkin’s “own eyes”. What was available for Abdirkin’s eyes on November 14, 1963 was rather meager. There was simply the ESLI primary policy insuring against fraudulent title documents of $1 million on any one loan, with a further limitation of $1 million on all losses arising or resulting from transactions with any one borrower. Even as to this coverage, plaintiff was a 10% coinsurer, so that all that stood between Scarburgh and a $23 million plus loss was the integrity of the Allied warehouse receipts.
It is against this backdrop of plaintiff’s well-founded panic that the conduct of its insurance representatives at the November 15 meeting must be evaluated. Into those negotiations was thrust a new figure, Stephens, whose participation was explained to Blackman by Lucey as called for by reason of Stephens’ familiarity with the primary ESLI coverage.
Stephens came to that meeting armed with a draft of a so-called “step-down” indorsement which, if agreed to, would create fraudulent document coverage in an unlimited amount. This coverage was to be accomplished at an annual premium of $7,500, in contrast to the $40,000 annual premium of the highly limited ESLI “primary” coverage.
On November 19, the same day that Allied filed its bankruptcy petition in the Federal court at Newark, New Jersey, Stephens wrote a letter to Blackman which purported to confirm as agreed all of the operative terms of the unlimited step-down coverage. Although Stephens, in a deposition read in evidence, contended that full agreement was reached on November 15, this court credits *776 Blackman’s testimony in open court to the contrary, and holds that Stephens’ letter is an entirely self-serving and unreliable assertion of an agreement where none was in fact reached.
Stephens’ letter shows a receipt stamp by the Blackman office on Thursday, November 21. After routing it to Bu-glass, Blackman left the office early.
The following day was Friday, November 22. Early that day Isbrandtsen, unable to obtain possession of an oil cargo from the Allied storage tanks in Bayonne, New Jersey, was negotiating to borrow a cargo to avoid a delivery default. The preceding day, he had contacted the FBI to investigate the oil shortages in Bayonne. These efforts by Isbrandtsen, and any further analysis of Stephens’ letter at Blackman’s office that afternoon, were paralyzed, as was the entire Nation, by the news of President Kennedy’s assassination in Dallas, Texas.
This national tragedy was destined to play a part in the mini-drama involved in this case. Defendant’s office remained closed on Monday, November 25, and by the following day Blackman was ill and did not report to work.
On Tuesday morning, November 26, the Hall broker sent the formal indorsement upon which this action depends, together with an accompanying letter, to AMMI’s office by messenger. The messenger was routed to Buglass who ultimately signed and delivered the indorsement.
If plaintiff and its insurance brokers may be said to have failed to disclose material matters on November 15, certainly an avalanche of additional damaging information had accumulated from that time onward through and including November 26, when they ensnared Buglass into signing the indorsement. By that time there was no longer any doubt that what these brokers were doing was akin to obtaining fire insurance on a building that was already ablaze.
Among other things, there had been the following developments:
1. After a visit by Isbrandtsen president Abdirkin to Allied’s office in Bayonne, New Jersey, on November 18 following the dishonor of the $250,000 check, Abdirkin *777 learned that Allied was preparing to file a bankruptcy petition, which in fact was filed in the District Court of Newark, New Jersey, the following day.
2. By Tuesday, November 19, not only had Allied’s bankruptcy petition been filed, but plaintiff learned that independent surveyors were gouging and sampling the vegetable oil storage tanks at the Bayonne warehousing facility. It would strain credulity to suppose that the results of this activity, leading directly to discovery of the missing oil, was not immediately known to plaintiff.
3. On November 20 and 21, plaintiff was unable to meet the oil delivery demands of its own customer, Bunge Corporation, and by November 22, 1963 plaintiff issued a letter holding American Express Warehousing responsible for all loss resulting from the inability of Warehousing to comply with its delivery instructions.
4. Plaintiff was acting for an entity known as Bell Financial Corporation with respect to $4 million worth of warehouse receipt loans. On November 21, 1963, Bell’s insurance manager terminated plaintiff’s agency. In a letter dated Monday, November 25, Bell’s insurance manager, Robert B. Wiltshire, referred to a conversation with B. Lytton Johnston on the previous Friday afternoon to the effect that Johnston was reviewing another insurance policy “to ascertain whether he [Johnston] feels it provides insurance for fraudulent acts in losses of Soy. Bean Oil which physically was on the Bayonne premises .” (Emphasis supplied.)
From this and other proofs, it is indisputable that during the week ending Friday, November 22, 1963, both plaintiff and its broker were fully aware that there were shortages in the commodity secured by the warehouse receipts in plaintiff’s transactions with Allied.
2. Scarburgh’s Legal Duty to Disclose
Quite appropriately, counsel on both sides agree that a higher duty of disclosure is imposed upon an applicant for marine insurance than one who is seeking to insure a casualty or other “inland marine” risk (Stecker v American Home Fire Assur. Co., 299 NY 1).
*778 While that distinction was critical in Stecker (supra [failure to disclose the prior criminal record of the insured fur merchant held insufficient to avoid inland marine policy]), it does not loom as decisive in this litigation.
Significantly, one of plaintiff’s principal brokers, Lucey, testified as to his understanding of the standard of disclosure required in these negotiations as follows: “The rules require that the risk be presented completely to the underwriter, the withholding of no pertinent information that might influence his judgment as to the acceptance or the denial of the risk.”
This court finds no reason to disagree with Mr. Lucey as to the applicable standard of conduct.
The court holds that the marine rule of the utmost good faith in disclosure (uberrima fides) is clearly appropriate here (Gulfstream Cargo v Reliance Ins. Co., 409 F2d 974; Pacific Queen Fisheries v Symes, 307 F2d 700; Morton v Home Ins. Co., N. Y., 32 AD2d 621). The excess policy itself is headed “ocean marine policy” and the primary risk insured was hull protection and indemnity on two named vessels with a proviso that four other named vessels would be added to the policy upon payment of an additional premium of $750 each.
Even without the additional four vessels, the hull risk exposure was over $12 million and the protection and indemnity exposure was an additional $10 million with an over-all limitation of loss of $10 million.
Inasmuch as the scope of the coverage under the fraudulent document indorsement was at no time indicated, and because both plaintiff’s broker and defendant’s underwriter were predominantly marine experts, the content of the putative insurance policy supposedly brought into being on November 26 could only be regarded fairly as a predominantly marine risk.
Plaintiff, of course, urges that the fraudulent document coverage, even though represented by an indorsement to an ocean marine policy, should be severed from the marine context and viewed in splendid isolation as an inland risk. Under this analysis, an insurance applicant has no duty of affirmative disclosure; his obligation is to make *779 truthful answers to questions which the underwriter may put to him. Even here, however, an important proviso remains: The silence of the applicant cannot be fraudulent (Miller v New Amsterdam Cas. Co., 248 App Div 272; Sebring v Fidelity-Phenix Fire Ins. Co. of N. Y., 255 NY 382; Rosenfeld v Union Ins. Soc. of Canton, 157 F Supp 395).
Logically, there can be many situations where the two disclosure duties overlap and where an item of information is so material to the risk that there is a clear duty of disclosure irrespective of the legal standard (Hare & Chase v National Sur. Co., 60 F2d 909).
In Hare, the assured was in the business of financing passenger automobiles and insured the promissory notes received with defendant. Negotiations for a renewal of this insurance took up almost an entire year, during which the assured entered into a contract with General Finance Corporation to rediscount taxicab purchase money notes. On the date the renewal policy issued, the assured held more than $1,000,000 of such taxicab financial paper.
The policy contained a requirement that the assured report the amount and character of the transactions on a periodic basis. The taxicab transactions were never reported. Despite the nondisclosure of the taxicab risk and the fact that it was never reported to the carrier, a successor in interest asserted a taxicab loss claim.
In affirming an injunction against further prosecution at law granted by the District Court, the Second Circuit held (supra, p 911): “The reasons underlying the rule are expressed in the leading case of Carter v. Boehm, 3 Burr. 1905, where Lord Mansfield explained that insurance is a contract upon speculation, and, since the special facts upon which the contingent chance is to be computed most commonly lie in the knowledge of the insured only, the underwriter proceeds upon confidence that he does not hold back any known fact affecting the risk, and is deceived if such a fact is concealed, even though its suppression should happen through mistake and without fraudulent intention. While this principle still persists in full *780 vigor in marine insurance, it has been relaxed, at least in the United States, in the case of fire and life policies because of the practice of insurers to make inspections or ask questions which may reasonably be supposed by the insured to produce whatever information the insurer wants *** We think the marine rule is exceptional only because in other types of insurance the applicant usually may honestly consider himself discharged from any duty of affirmative disclosure about matters concerning which he has not been interrogated. Where that is not the case, the rule of uberrima fides should still be enforced.”
As in the Hare case, this court holds that under either rule there was a clear duty to disclose the magnitude of Scarburgh’s financing operations with a single borrower, particularly where facts detrimental to the integrity of that single borrower were known to Scarburgh. The magnitude of the nondisclosure here went to the fundamental identity and specification of the risk to be insured. Its materiality was so fundamental as to reach even beyond fraud and to raise a question as to whether the minds of the parties had ever effectively met on the description of the risk to be insured.
Whether the nondisclosure was so great as to impair the very formation of the insurance contract, or whether it provides a predicate for cancellation of coverage on the ground of fraud, is not necessary to determine, because under either view the result is the same. Defendant’s signature and delivery of the indorsement on November 26, 1963 was a legal nullity.
This is not to say under a different set of circumstances the distinction between the rule of uberrima fides and the ordinary disclosure rule might not be significant. Where the alleged nondisclosure is inadvertent and there have been no affirmative acts of concealment, nondisclosure would not avoid the policy. That is the rationale of the result reached in Stecker v American Home Fire Assur. Co. (supra).
In the case at bar, however, plaintiff’s nondisclosure was contrived, calculated and persistent over a five-month period. Wholly apart from plaintiff’s failure to disclose the *781 information it had acquired at the end of this period with respect to deterioration of the risk sought to be insured was plaintiff’s careful concealment of all facts pertaining to the magnitude, identity and character of that risk. Plaintiff was under a clear affirmative duty to disclose the latter regardless of the standard to be applied. There is no contention that plaintiff met that duty, but, on the contrary, actively evaded it.
For the foregoing reasons, the complaint is now dismissed, with costs, and defendant may have judgment accordingly.