PAUL C. NORDBERG AND DEBRA L. NORDBERG, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 17754–80.     Filed October 18, 1982.

656

Paul C. Nordberg, pro se.
*John C. Galluzzo, Jr.*, for the respondent.

RAUM, *Judge*: The Commissioner determined an income tax deficiency of $4,396.29 against petitioners Paul and Debra Nordberg for the taxable year ended December 31, 1978. Petitioners, in addition to disputing the deficiency, claim an overpayment of $5,186.26 in income taxes paid for 1978.[1] In respect of both the deficiency and the asserted overpayment, the only issue for decision is whether $100,000 received by Paul Nordberg in 1978 was a loan or was a partial payment on certain notes in which he held an interest, resulting in the receipt of taxable gain to the extent that the amount received exceeded his basis in those notes.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Petitioners, husband and wife, filed a joint Federal income tax return for 1978. At the time their petition was filed, they resided in Auburn, Mass. Since Debra Nordberg is a petitioner herein only by virtue of having filed a joint return for 1978, Paul Nordberg will sometimes hereinafter be referred to as petitioner.

This case grows out of the notorious salad oil scandal which surfaced in 1963. It involved a corporation controlled by a person named D'Angelis, which had borrowed some $125 million on the security of warehouse receipts for salad oil

---

[1] In addition to this asserted overpayment, the petition alleges that a $5,536.21 overpayment is due to petitioners for 1979. We may not consider any issue in respect of the 1979 tax year, however, for the deficiency determined by the Commissioner relates only to 1978, and we therefore "have no jurisdiction to determine whether or not the tax for any other year or calendar quarter has been overpaid or underpaid." Sec. 6214(b), I.R.C. 1954.

issued by a subsidiary of the American Express Co. It turned out that some $128 million worth of salad oil purportedly in the tanks was "missing." Mr. D'Angelis was convicted of criminal offenses relating thereto; and the creditors were left with claims against Mr. D'Angelis and his corporation that were virtually worthless. One of those creditors was Scarburgh Co., Inc. (Scarburgh), a privately owned commercial finance company which had made loans of about $24 million on the security of the salad oil warehouse receipts. Scarburgh in turn had borrowed large amounts of money (some $24 million) from banks putting up as security these very warehouse receipts. It was also indebted to certain unsecured creditors. After the scandal broke, Scarburgh ceased being an operating company, and instead was engaged in efforts to settle not only the claims which it had against others (particularly the American Express Co. and its subsidiary, as well as three insurance companies) but also the claims which its own creditors had against Scarburgh itself.

Scarburgh's own creditors included not only the banks which had made loans to it on the basis of the warehouse receipts as collateral (the secured creditors), but also certain unsecured creditors, notably, six financial institutions which had purchased a $4 million issue of Scarburgh's six-percent subordinated notes in 1962 (the subordinated notes). It also had a potential unsecured liability of $925,041.72 to the Chase Manhattan Bank (Chase Manhattan) in respect of a claim under a guarantee of certain loans and advances made by Chase Manhattan to a third party. The record does not disclose whether, or to what extent, there had been a default or defaults by that third party, the primary debtor, or whether or to what extent Scarburgh may have had defenses against such claim. To the extent that Chase Manhattan's $925,041.72 claim under the guarantee was enforceable, it was senior to the rights of the holders of the subordinated notes.

By September 9, 1966, an understanding had been reached between the American Express Co. and its subsidiary, on the one hand, and Scarburgh and Scarburgh's secured creditors as

to the amount that the American Express Co. would pay in respect of the worthless warehouse receipts.[2] In addition, Scarburgh had either come to an agreement, or expected to come to an agreement, with two of the three insurance companies in respect of reimbursement for a portion of the loss sustained by reason of the salad oil fraud. On September 9, 1966, Scarburgh entered into a complicated agreement with its creditors concerning the priority of payment of their respective claims. The funds to be received from the American Express Co. and the insurance companies, in addition to other possible assets of Scarburgh, were to be sources for payments to Scarburgh's creditors.

To the extent relevant herein, the September 9, 1966, agreement in essence provided that payments, as specified in the agreement, would be made first to "the banks" (the secured creditors). Second in priority was the $925,041.72 unsecured claim "allegedly owing" to Chase Manhattan, and third in priority was the principal amount of the subordinated notes. The $4 million total principal amount of the subordinated notes outstanding was divided among six institutions as follows:

| | |
|---|---|
| State Mutual Life Assurance Co. of America | $750,000 |
| Paul Revere Life Insurance Co | 1,000,000 |
| Bessemer Securities Corp | 500,000 |
| George Putnam Fund of Boston | 750,000 |
| Country Life Insurance Co | 500,000 |
| Massachusetts Mutual Life Insurance Co | 500,000 |
| | 4,000,000 |

By 1972, Scarburgh had settled most of its claims against the American Express Co. and two of the insurance companies. Its only remaining claim of any substance still being pursued was against the third insurance company, the American Manufacturers Mutual Insurance Co. (AMMI), in the amount of approximately $28 million. Although Scarburgh had made

[2]It also appears that the accounting firm which had audited and apparently approved the accounts prior to the exposure of the salad oil fraud contributed to the amount payable by the American Express Co.

substantial payments to its secured creditors (the banks), it had made no payments to Chase Manhattan or the holders of the subordinated notes.

Petitioner Paul Nordberg was a high school student when the salad oil scandal became public in 1963. He later went to Dartmouth College as an undergraduate and thereafter obtained a graduate degree in business administration from Dartmouth. After completing his graduate work, he became (around 1972 or 1973) an employee in the investment department of State Mutual Life Assurance Co. of America (State Mutual), a life insurance company based in Worcester, Mass. Like the other five holders of Scarburgh's subordinated notes, State Mutual had not received any payments on its $750,000 of notes. In 1975, State Mutual decided to dispose of the notes. In the latter part of 1975 petitioner arranged for a friend, Joseph P. Doherty, an "administrative assistant" to a Congressman, to purchase the $750,000 of notes from State Mutual for the token amount of about $100. On April 1, 1977, petitioner, who was then in the process of terminating his employment with State Mutual, purchased two-thirds of Mr. Doherty's notes (in the face amount of $500,000) for $10,000. The latter amount represented about two-thirds of the legal fees which Mr. Doherty had incurred in respect of the notes. Petitioner subsequently, by May 1978, had in addition expended $11,382.84 in legal fees related to this investment, giving a basis of $21,382.84 in the notes. Mr. Doherty remained the record holder of the entire $750,000 of notes, but it was clearly understood that petitioner had a two-thirds interest therein. Petitioner had meanwhile become an "administrative assistant" to a Congressman, but the record does not disclose whether it was the same Congressman for whom Mr. Doherty had worked.

In May 1978, Scarburgh decided to distribute $800,000 to the holders of the subordinated notes. At trial, petitioner testified that Scarburgh's motivation for making this distribution was to remove these funds from the reach of its attorneys, who had charged Scarburgh nearly $1 million in respect of the AMMI litigation without even bringing the case to trial.[3] According to

---

[3] At this point, Scarburgh had filed suit against AMMI and the parties were still preparing for trial. On Nov. 1, 1979, judgment was entered for AMMI dismissing Scarburgh's

petitioner, this action was taken in the hope that it would force the attorneys to proceed rapidly to a conclusion of the litigation, since the $800,000 distribution apparently eliminated the only, or at least major, then-available source of funds from which future legal fees could be collected. At this time, although Scarburgh had already made substantial payments to its secured creditors, its debt to them had not yet been fully discharged, and it had not made any payment on the Chase Manhattan claim. Nevertheless, the record indicates, without any meaningful explanation, that these creditors acquiesced in Scarburgh's plan to distribute the $800,000 to the noteholders, whose rights were of a lower order of priority under the September 9, 1966, agreement. In accordance with the plan, Scarburgh entered into a new agreement on May 31, 1978, with the six noteholders of record, i.e., the five financial institutions and Mr. Doherty. Relevant provisions of that agreement are as follows:

THIS AGREEMENT, made as of the 31st day of May, 1978, by and among SCARBURGH COMPANY, INC., a Delaware corporation ("Scarburgh"), and BESSEMER SECURITIES CORPORATION, COUNTRY LIFE INSURANCE COMPANY, THE GEORGE PUTNAM FUND OF BOSTON, MASSACHU-SETTS MUTUAL LIFE INSURANCE COMPANY, THE PAUL REVERE LIFE INSURANCE COMPANY and JOSEPH P. DOHERTY[4] (being herein-after referred to collectively as the "Noteholders"),

WITNESSETH:

WHEREAS, Scarburgh wishes to distribute certain funds from time to time in repayment of the principal amount of the 6% Subordinated Notes issued by Scarburgh on July 26, 1972 (the "Funds") to the Noteholders who execute this Agreement; and

WHEREAS, Scarburgh and the Noteholders recognize that a claim or claims could possibly be asserted against Scarburgh or its officers and Directors; and

WHEREAS, Scarburgh and the Noteholders further recognize that if such a claim or claims against Scarburgh or its officers and Directors is asserted,

---

complaint. See *Scarburgh Co. v. American Manufacturers Mutual Insurance Co.*, 107 Misc. 2d 772, 435 N.Y.S.2d 997 (Sup.Ct. 1979), affd. 79 App. Div. 2d 942, 439 N.Y.S.2d 298 (1st Dept. 1981), leave to appeal denied 53 N.Y.2d 1056, 425 N.E.2d 889, 442 N.Y.S.2d 501 (1981).

[4]The underscoring in the photocopy of the typewritten agreement in evidence appears to have been made by hand with a straight edge and probably was not part of the original executed agreement.

either in a legal proceeding or otherwise, <u>it may be necessary for the Noteholders to pay back part or all of the funds distributed hereunder.</u>[5]

Now, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and other good and valuable consideration the receipt of which is hereby acknowledged, the parties do hereby agree as follows:

1. In the event that a claim against Scarburgh or its officers and Directors is asserted either in a legal proceeding or otherwise, the Noteholders, upon written notice from Scarburgh, each agree to pay back to Scarburgh, within twenty (20) days thereafter on a pro-rata basis, such amount of the Funds as may have been distributed to them, as shall be specified by Scarburgh in such notice; the amounts paid back hereunder to be used to pay Scarburgh's or its officers' and Directors' expenses, including legal fees, incurred by it or them in connection with defending or settling any such claim or to pay any judgment or judgments obtained against it or them.

As used in this paragraph, "pro-rata" shall mean the percentage that the principal amount of each Noteholders' [sic] 6% Subordinated Note bears to $4 million.

2. In the event any Noteholder shall default in its or his obligation pursuant to paragraph 1 hereof, the nondefaulting Noteholders shall fulfill within twenty (20) days after receipt of notice of such default from Scarburgh, on a pro-rata basis but not in excess of the distributions to him or it, the obligation of any defaulting Noteholder. Within twenty (20) days after notice of such default, Scarburgh agrees to commence an action on behalf of the non-defaulting Noteholders against the defaulting Noteholder or Noteholders and to distribute the proceeds of any judgment or settlement of that action to the non-defaulting Noteholders.

As used in this paragraph, "pro-rata" shall mean the percentage that the principal amount of each non-defaulting Noteholders' [sic] 6% Subordinated Note bears to the aggregate principal amount of all non-defaulting Noteholders [sic] 6% Subordinated Notes.

3. The Noteholders shall indemnify Scarburgh and the officers and Directors of Scarburgh against any and all liabilities, which may arise by reason of the distributions made hereunder to the extent of the Funds that have been distributed to them and not repaid to Scarburgh.

In respect of the notes in which petitioner held a two-thirds interest, the agreement was executed, as indicated above, by Joseph P. Doherty as the noteholder of record. It is stipulated, however, that petitioner is bound by the agreement, and that if repayment to Scarburgh is required, then petitioner will be liable for two-thirds of the amount due from Joseph P. Doherty. It is nevertheless not clear whether such contingent liability would run directly to Scarburgh, or whether it was a

---

[5]See note 4 *supra*.

derivative liability to reimburse Mr. Doherty for two-thirds of whatever amount Mr. Doherty was liable to return, and had in fact returned, to Scarburgh.

In June of 1978, Scarburgh distributed $800,000 to the noteholders pro rata. Accordingly, petitioner received $100,000 as his share of the distribution, or two-thirds of the $150,000 payable to Mr. Doherty. Upon receipt of the money, petitioner neither segregated it from his other assets nor retained it in liquid form, so as to have it available in the event that repayment to Scarburgh were required. Instead, he rapidly spent virtually all of the $100,000 during the remainder of 1978. He used $20,000 to repay student loans at Dartmouth. He expended approximately $10,000 for the construction of a swimming pool and fence behind his house. He used substantially all of the remaining $70,000 for an addition of four bedrooms and two bathrooms to his house, for some legal fees, and for a long four- or five-day "weekend" trip to Bermuda.

In the event that petitioner had been required to restore the $100,000 upon 20 days' notice under the May 31, 1978, agreement, his financial resources were such that, after having spent the $100,000, it is not probable that he would have been able at that time to make the required restoration. The only liquid assets owned by petitioners were two checking accounts with an aggregate balance of some $4,000 or $6,000. Their home was subject to both a first and a second mortgage. In their income tax return for 1978 they reported no income from dividends, interest, or rents, and the record fails to disclose that they had any securities, savings accounts, real estate (other than their home), or any other assets, real or personal, of any consequence. Petitioner was then 31 years of age, married, and had three dependent children. Petitioners' only reported income for 1978 (apart from the receipt of $100,000 on the notes) was Paul Nordberg's salary in the amount of $28,384.98, which he had earned as an administrative assistant to a Congressman. Their reported deductions for interest paid during 1978 in respect of their outstanding debts—including mortgage obligations—were in the aggregate amount of $7,794. Petitioner testified that, if he were required to return the $100,000 distributed to him, he expected to borrow the entire amount using the "equity" in his home as

security. However, the record does not convincingly establish that any such amount could have been borrowed at that time, or that he then, in fact, realistically entertained any such intention.

On their joint 1978 Federal income tax return, petitioners reported a long-term capital gain of $78,617.16, computed as the difference between the $100,000 received from Scarburgh and the $21,382.84 basis in the notes.[6] In an amended 1978 return, petitioner deleted this gain from his income and claimed a refund, stating:

I substantially overstated my total income. I erred in stating as "income" the cash received from a borrowing. I am unconditionally obligated, on demand, to repay the amount which I have reflected as a "capital gain" to the corporation from which I received it.

The Commissioner determined a deficiency for 1978, asserting that petitioner was subject to the minimum tax imposed by section 56(a), I.R.C. 1954, on tax-preference items (here, the long-term capital gain deduction). The Commissioner also disallowed the refund claimed on petitioner's amended 1978 return. Petitioner had conceded that the minimum tax is applicable if the $78,617.16 gain must be included in income in 1978.

## OPINION

The agreement of May 31, 1978, between Scarburgh and the holders of its $4 million issue of subordinated notes recited that Scarburgh wished "to distribute certain funds from time to time in repayment of the principal amount" of the notes to the noteholders, and that if a claim or claims against Scarburgh or its officers and directors were asserted, "it may be necessary for the Noteholders to pay back part or all of the funds distributed hereunder." The agreement further provided that in the event that such a claim were asserted, the noteholders, "upon written notice from Scarburgh, each agree to pay back to Scarburgh, within twenty (20) days thereafter on a pro-rata basis, such amount of the Funds as may have

---

[6]Although it would appear that only a portion of petitioner's basis would be allocable to this partial repayment for purposes of computing petitioner's gain, respondent's counsel conceded at trial that the Government was not challenging the computation of the gain as reported on petitioner's 1978 return.

been distributed to them." Pursuant to this agreement, Paul Nordberg received a $100,000 distribution in 1978 on his $500,000 notes. Up to the time of trial herein (October 1981), no demand for repayment of the $100,000 or any portion thereof had been made,[7] nor is there any evidence in the record that any such demand was being contemplated. The receipt of the $100,000 was reported on petitioners' 1978 return as being a payment on the notes, and the difference between that amount and Paul Nordberg's basis in the notes ($21,382.84) was reported as capital gain. They now seek to disavow that treatment, and argue that no part of the $100,000 received constitutes taxable income. We hold otherwise.

This case presents merely another variation of the familiar "claim of right" doctrine pursuant to which the receipt of money under a claim of right which would otherwise represent taxable income must be treated as taxable income even though the recipient may be under a contingent obligation to return it at a later time. In *North American Oil Consolidated v. Burnet*, 286 U.S. 417 (1932), often regarded as the seminal case in this area, the Supreme Court stated (at 424):

If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent. [Citations omitted.]

Although this doctrine has been applied "in a variety of contexts," the situations have shared "a common factual element: the receipt of money or other property by a taxpayer with an imperfect right to retain it." Wootton, "The Claim of Right Doctrine and Section 1341," 34 Tax Law. 297 (1981). Here, the money was received without restriction as to its disposition by petitioner, and he in fact expended virtually all of it in 1978 to pay college debts, to install a swimming pool, to construct an addition to his house, to pay legal fees, and even to finance a pleasure trip to Bermuda. We hold that the claim of right doctrine is applicable here.

---

[7] For purposes of this opinion, we will not make anything turn upon whether petitioner's contingent obligation ran directly to Scarburgh, or whether it was a derivative obligation running in the first instance to Mr. Doherty. Since both parties hereto treat petitioner's obligation as running directly to Scarburgh, we will so consider it here.

Proceeding from the indisputable premise that "One of the basic aspects of the federal income tax is that there be an annual accounting of income" (*Healy v. Commissioner*, 345 U.S. 278, 281 (1953); fn. ref. omitted), the receipt of funds, without restriction as to use or disposition, must trigger the incidence of taxation, unless "in the year of receipt a taxpayer recognizes his liability under an existing and fixed obligation to repay the amount received and makes provisions for repayment." *Hope v. Commissioner*, 55 T.C. 1020, 1030 (1971), affd. 471 F.2d 738 (3d Cir. 1973), cert. denied 414 U.S. 824 (1973). As we have stated, "The mere fact that income received by a taxpayer may have to be returned at some later time does not deprive it of its character as taxable income when received" (*Woolard v. Commissioner*, 47 T.C. 274, 279 (1966); citations omitted), and the claim of right doctrine will apply "notwithstanding that the taxpayer may be under a contingent obligation to restore the funds at some future point" (*Professional Insurance Agents of Michigan v. Commissioner*, 78 T.C. 246, 270 (1982); citations omitted). Where the taxpayer is required to repay some or all of the money in a later year, a deduction may then be available to him in the later year to the extent permitted by law (see *Krim-Ko Corp. v. Commissioner*, 16 T.C. 31, 40 (1951)),[8] but the amounts are income nonetheless in the year of receipt.

To avoid the application of the claim of right doctrine, the recipient must at least recognize in the year of receipt "an existing and *fixed* obligation to repay the amount received" and "*make provisions* for repayment." (Emphasis supplied.) See *Hope v. Commissioner, supra.* Neither of these requirements is satisfied in this case. Here, there was a *contingent*, not a *fixed*, obligation to repay the amount received. Moreover, petitioner made no "provisions for repayment." He testified that if called upon to make repayment, he intended to use the "equity" in his house to borrow funds for that purpose. No specific prospective lender was identified, nor was there any convincing evidence that he had made arrangements with any

---

[8]Sec. 1341, I.R.C. 1954, offers even greater relief, in certain circumstances, by allowing the taxpayer to choose, in the year of repayment, between a deduction for the amount of the repayment and, in effect, a credit for the amount of tax that would have been saved in the year of inclusion if the repaid amount had been excluded from that year's gross income.

specific lender for such loan in the event that Scarburgh issued its 20-day notice. His testimony that two unidentified banks in Worcester were familiar with his house certainly does not establish that he had made "provisions for repayment." And his mere intention to borrow on the "equity" in his house hardly qualifies as "provisions" made for repayment. Furthermore, even assuming a certain amount of optimism on petitioner's part, the existence of any such bona fide intention to raise $100,000 in 1978 on the security of the "equity" in his house seems open to serious question in the circumstances of this case.[9]

Petitioner attempts to sidestep the entire claim of right doctrine, contending that the transfer of funds from Scarburgh to the noteholders was merely a "loan." Of course, if it were truly a loan, the receipt of loan proceeds would not constitute taxable income. According to petitioner, Scarburgh was not at liberty to distribute these funds in repayment of the subordinated notes, because it had not yet paid off the senior creditors as required by the September 9, 1966, agreement. Instead, the funds were allegedly "advanced" simply to put them beyond the reach of Scarburgh's lawyers. Consistent with his characterization of this distribution as a loan, petitioner argues further that the money was not received under a claim of right, because in the year of receipt there was a recognized

---

[9]Petitioner was then 31 years old, married, with three dependent children. The sole income of both spouses in 1978 was petitioner's $28,384.98 salary. He and his wife had no assets of any consequence apart from two checking accounts in the aggregate amount of $4,000 or $6,000 and their home that was already subject to two mortgages. Their total interest payments in 1978 on all outstanding debts (including home mortgage obligations) were $7,794. We do not believe his testimony that he could then—in 1978—have borrowed $100,000 additional on the "equity" in his home, notwithstanding its increased value due to his improvements. While it is true that there may have been a substantial or even spectacular increase in real estate values between 1978 and 1981, hindsight may not be used to assume that a bank or any other responsible financial institution would have made a further loan of $100,000 in 1978 on the security of petitioner's house in the light of the facts of this case, however benignly disposed such bank or financial institution may have been towards petitioner. Moreover, it must be kept in mind that even such hypothetical $100,000 loan would have entailed an interest burden together with probable obligation for periodic repayment of principal that, coupled with petitioner's other debt obligations and living expenses for himself and his family, would have been wholly out of proportion to, or even beyond, his comparatively modest earnings and resources. It puts too much strain on our credulity to believe that petitioner, who impressed us as intelligent and sophisticated, had any serious intention in 1978 to obtain approval of a $100,000 loan from some undisclosed lender on the "equity" in his house and actually get the proceeds of such loan within 20 days after receiving notice from Scarburgh.

obligation of repayment upon 20 days' notice from Scarburgh. We disagree as to the significance of this repayment obligation, and we hold that the funds were received under a claim of right in 1978. Scarburgh made a distribution to the noteholders in proportion to the face amount of their notes, subject only to a contingency to restore such amount or possibly only a portion thereof. Unlike a typical loan, there was no fixed maturity date, nor were the distributees liable for any interest on the amounts distributed. As one of the distributees, petitioner received his proportionate share under a "claim of right."

To be sure, a fixed maturity date and an obligation to pay interest are not indispensable elements of a loan. But their absence calls for careful scrutiny of the transaction, and casts serious doubt upon petitioner's belated attempt to recharacterize as a "loan" that which the parties to the May 31, 1978, agreement have described as a distribution in "repayment of the principal amount" of the notes. However, the noteholders' obligation to return the amounts distributed to them, or a portion thereof, was plainly conditional—a circumstance that is typical of the claim of right doctrine. The agreement states that "it *may* be necessary" for the recipients to repay some or all of the funds "*if* such a claim or claims against Scarburgh or its officers and Directors is asserted" (emphasis added). The agreement fails to identify the nature of these so-called "claims." We can only surmise that these provisions refer to the potential Chase Manhattan claim in respect of its third-party guarantee and possible residual claims of the secured creditors. However, the record leaves much to be desired in connection with the "claims" referred to in the agreement. The absence of any credible explanation for the acquiescence of the secured creditors and Chase Manhattan to the distribution strongly suggests that there is more to the picture than has been revealed to us, particularly since they do not appear to have made any demands or asserted claims during the period of more than 3 years since the May 31, 1978, agreement. For aught we know, there may well have been facts in support of the possible conclusion that the assertion of claims would be unlikely. And petitioner's rapid expenditure of virtually the entire $100,000 during 1978 in circumstances indicating his probable understanding of the absence of

likelihood that he would be called upon to repay that amount (see note 8 *supra*) gives at least some support to that conclusion. If there was in fact any credible explanation for the acquiescence in the distribution by Chase Manhattan and the secured creditors as well as for their failure to present any claims for at least 3 years thereafter, it was petitioner's burden to present evidence to prove it, but he has not done so.

In short, we conclude on the record before us that this is a classic example of a "claim of right" case, and that petitioner has not established that his conditional obligation to restore the amount distributed to him calls for the reclassification of the distribution as a "loan."

*Decision will be entered for the respondent.*